**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 15-20299-CR-COOKE**

**UNITED STATES OF AMERICA,**

**vs.**

**PEDRO LUIS MARTIN OLIVARES,**

**Defendant.**
_____/

**DEFENDANT'S MOTION TO DISMISS INDICTMENT FOR VIOLATION
OF HIS SIXTH AMENDMENT RIGHT TO A SPEEDY TRIAL
AND SUPPORTING MEMORANDUM OF LAW**

Defendant, Pedro Luis Martin Olivares ("Martin")**,** by and through undersigned counsel, and pursuant to Federal Rule of Criminal Procedure 48(b), files this motion to dismiss indictment for violation of his Sixth Amendment right to a speedy trial and in support thereof states:

## I.      INTRODUCTION

The Government has no justification for failing to prosecute this case for years after Martin's indictment when it has known all along of his whereabouts and has had ample opportunities to extradite him from Venezuela and other countries to which he has travelled, including Panama and Aruba.  Given the extradition treaty between the U.S. and Venezuela, and the Venezuelan government's explicit

cooperation when he was detained there, the Government could easily have filed for Martin's direct formal extradition, but chose not to do so. In addition the Government took no action to this open and known travel to Panama and Aruba. The inordinate and unjustifiable delay that Martin has been subjected to is a violation of his Sixth Amendment right to a speedy trial, and the indictment against him should be dismissed on that basis.

## II.    FACTUAL BACKGROUND

Almost 6 years ago, on July 15, 2011, a drug trafficking organization that allegedly included Martin ("Hurtado Organization"), was indicted on July 15, 2011 for conspiracy to distribute cocaine with knowledge that it would be unlawfully imported into the United States, in violation of 21 U.S.C. § 959(a)(2), and possession with intent to distribute cocaine on board an aircraft registered in the United States, in violation of 21 U.S.C. § 959(b). *United States v. Roberto Mendez-Hurtado, et al*, Case no. 11-20478-CR-COOKE, (S.D. Fla. July 18, 2011) (DE 3) ("First Indictment").  A copy of the 2011 Indictment is attached hereto as Exhibit A.  According to the Government, the conspiracy spanned from about January 2000 until September 2010 (Exhibit "A").  Although the alleged conspiracy ended in 2010, and Martin was indicted the next year, in 2011, to this day the Government has taken *no* action to prosecute the alleged crimes.  It is now 17

years after the conspiracy allegedly began and the Government is still sitting on its hands.

Within a year (if not sooner) of the First Indictment in 2011, the Government was well-aware of Martin's whereabouts, because he lived openly, under his own name, as a resident of Venezuela.  Moreover, the Government was aware of his location when he travelled outside Venezuela.  Indeed, Martin took numerous trips outside Venezuela after the First Indictment to both Panama and Aruba—countries with very open extradition policies with the U.S. (A copy of the pages of Martin's passport, with stamps showing his travel, is attached as Exhibit "B").  Yet, the Government took no action to bring him to trial.  In fact, although the Government had numerous opportunities to take action to detain and extradite Martin, it failed to do so.

For example, the DEA knew of Martin's whereabouts and activities during one of his trips to Panama in 2012.  The DEA not only knew that Martin was in Panama, but knew where he was staying, his precise location, and where he was conducting business.  Despite this knowledge, and the close proximity of DEA agents in Panama as they conducted surveillance of him, the DEA did not attempt to bring Martin under the jurisdiction of the U.S.  This mishandled opportunity resulted in the continued delay of Martin's trial, infringing upon his right to a speedy trial.

On April 24, 2015 – 4 years after the First Indictment –  Martin was again indicted ("Second Indictment").  The offenses in the Second Indictment are the *same* as those in the First Indictment (DE 3).  Indeed, the Certificate of Trial Attorney filed with the Second Indictment acknowledges that "this case has been previously filed in this District Court" (DE 3).  The same day the Second Indictment was returned, the Government obtained an order sealing it (DE 1, 2). Despite it obtained a Second Indictment, the Government has again made no effort in the two (2) years since then to bring Martin to the United States to face trial.

On July 18, 2015, a few months after the Second Indictment, a Red Notice by Interpol was issued for him, which is essentially an international arrest warrant based upon his U.S. federal indictment (INTERPOL, *Red Notice A-5814/7-2015* (July 18, 2015) attached as Exhibit "C") ("the Red Notice").  The Red Notice stated that the Hurtado Organization regularly paid Martin to allow drug planes to depart Venezuela safely, and without military or law enforcement interference (Exhibit "C").  Its purpose was to ensure that Martin would be detained if captured in Venezuela or another country that is a partner with Interpol (Exhibit "C").  Two weeks later, on July 31, 2015, a sealed order was entered that transferred Martin to "fugitive" status, although he was in not a fugitive in any sense of the word (DE 5).

Although the Second Indictment was sealed, Martin became aware of a Facebook posting stating that he had been indicted by the U.S.  Thereafter, on

August 26, 2015, just 4 months after the Second Indictment, Martin willingly surrendered himself into Interpol. Pursuant to the Red Notice requesting his preventive detention, Venezuela immediately took him into custody.

On September 24, 2015, the Second Indictment was unsealed at the Government's request (DE 6, 7).  On October 7, 2015, Venezuelan authorities notified the U.S. Government that Martin was apprehended and advised that the U.S. had "sixty (60) calendar days after its notification to submit the formal request for extradition[.]" (El Tribunal Supremo de Justicia [Supreme Court of Justice] Jan. 21, 2016, 3 (Venez.) (Exhibit "D").  On November 6, 2015, the U.S. replied that it did *not* intend to submit a formal extradition request for Martin, despite the existence of a valid extradition treaty between the countries.  Accordingly, the Government waived its right to have Martin extradited from Venezuela (Exhibit "D", at 3).  On January 6, 2016, after more than 4 months with his freedom restricted, the Venezuelan courts finally ordered Martin's release, stating "it is clear that the United States of America's Government's judiciay [sic] expresses a formal and manifest disinterest in the extradition request" (Exhibit "D" at 3).

The following table shows the undisputed chronology of events, including Martin's travel outside of Venezuela, all of which illustrate the numerous occasions on which the Government could have taken action to apprehend him— but failed to do so.

| UNDISPUTED CHRONOLOGY OF EVENTS | |
|---|---|
| January 2000 | Alleged conspiracy commenced. |
| September 2010 | Alleged conspiracy ended. |
| July 15, 2011 | 2011 Indictment returned. |
| April 27, 2012 | Mr. Martin traveled from Caracas to Aruba. |
| May 10, 2012 | Mr. Martin traveled from Aruba to Caracas. |
| June 8, 2012 | Mr. Martin traveled from Caracas to Aruba. |
| June 12, 2012 | Mr. Martin traveled from Aruba to Caracas. |
| July 30, 2012 | Mr. Martin traveled from Caracas to Aruba. |
| September 3, 2012 | Mr. Martin traveled from Aruba to Caracas. |
| October 9, 2012 | Mr. Martin traveled from Caracas to Aruba. |
| October 13, 2012 | Mr. Martin traveled from Aruba to Caracas. |
| October 18, 2012 | Mr. Martin traveled from Caracas to Tocumen, Panama. |
| October 22, 2012 | Mr. Martin traveled from Tocumen, Panama to Caracas. |
| December 2, 2012 | Mr. Martin traveled from Caracas to Tocumen, Panama. |
| December 3, 2012 | Mr. Martin traveled from Tocumen, Panama to Caracas. |
| December 19, 2012 | Mr. Martin traveled from Caracas to Aruba. |
| January 11, 2013 | Mr. Martin traveled from Aruba to Caracas. |
| January 25, 2013 | Mr. Martin traveled from Caracas to Aruba. |
| January 27, 2013 | Mr. Martin traveled from Aruba to Caracas. |
| March 1, 2013 | Mr. Martin traveled from Caracas to Aruba. |
| March 3, 2013 | Mr. Martin traveled from Aruba to Caracas. |
| March 24, 2013 | Mr. Martin traveled from Caracas to Aruba. |

| April 5, 2013 | Mr. Martin traveled from Aruba to Caracas. |
| May 14, 2013 | Mr. Martin traveled from Caracas to Aruba. |
| May 19, 2013 | Mr. Martin traveled from Aruba to Caracas. |
| June 6, 2013 | Mr. Martin traveled from Caracas to Aruba. |
| June 11, 2013 | Mr. Martin traveled from Aruba to Caracas. |
| September 4, 2013 | Mr. Martin traveled from Caracas to Aruba. |
| October 4, 2013 | Mr. Martin traveled from Aruba to Caracas. |
| January 8, 2014 | Mr. Martin traveled from Caracas to Aruba. |
| January 17, 2014 | Mr. Martin traveled from Aruba to Caracas. |
| February 13, 2014 | Mr. Martin traveled from Caracas to Aruba. |
| March 4, 2014 | Mr. Martin traveled from Aruba to Caracas. |
| April 4, 2014 | Mr. Martin traveled from Caracas to Aruba. |
| April 25, 2014 | Mr. Martin traveled from Aruba to Caracas. |
| July 6, 2014 | Mr. Martin traveled from Caracas to Aruba. |
| July 22, 2014 | Mr. Martin traveled from Aruba to Caracas. |
| October 2, 2014 | Mr. Martin traveled from Caracas to Aruba. |
| October 11, 2014 | Mr. Martin traveled from Aruba to Caracas. |
| April 24, 2015 | Indictment returned against Mr. Martin. |
| July 18, 2015 | Red Notice is issued for Mr. Martin. |
| July 31, 2015 | Mr. Martin is transferred to fugitive status. |
| August 26, 2015 | Mr. Martin surrenders to Interpol and is immediately taken into custody. |
| September 24, 2015 | Indictment is ordered unsealed. |
| October 7, 2015 | Venezuela notifies United States of Mr. Martin's apprehension. |

| November 6, 2015 | United States replies to Venezuela that it will not be filing a formal extradition request for Mr. Martin. |
|---|---|
| January 6, 2016 | Mr. Martin is released from Venezuelan custody. |

The extended delay has affected Martin's wellbeing physically and mentally. On August 8, 2015 and August 26, 2015, Martin received emergency medical attention. Despite his consistent cardio-metabolic condition prior to this time, Martin had hypertension and hyperglycemia—conditions he had never displayed prior—which led to a diagnosis of Type 2 Diabetes mellitus. (A copy of Martin's medical report is attached hereto as Exhibit "E").  Since August 2015, his medical conditions have worsened.  His current control has been more difficult to achieve, because of frequent hypertensive crises and glucose decompensations. Multiple treatment modifications have been required, including the need for insulin injections (Exhibit "E").  In addition to the physical effects, the stress of this egregiously delayed trial has also caused him to suffer from anxiety and depression, and requires medication to treat those symptoms (Exhibit "E").

It has now been more than seventeen (17) years since the conspiracy allegedly began in 2000; almost six (6) years since the alleged conspiracy ended in 2010; more than five (5) years since the First Indictment in 2011; and more than two (2) years since the Second Indictment; yet, Martin's case is still pending, or languishing, before this Court because of the Government's inaction.   The

Government has had ample time and opportunities to bring Martin to the U.S. but has made no effort whatsoever to do so.

## II.  ARGUMENT

The United States Constitution guarantees every individual accused of a crime the right to a speedy trial under the Sixth Amendment. *Barker v. Wingo*, 407 U.S. 514, 515 (1972).  This constitutional right is "triggered by arrest, indictment, or other formal accusation[.]" *Doggett v. U.S.*, 505 U.S. 647, 655 (1992).   In *Barker*, *supra*, the Supreme Court established the following four-factor test to determine when the Government has violated a defendant's constitutional right to a speedy trial: (1) length of delay; (2) the reason for the delay; (3) the defendant's assertion of his right; and (4) the prejudice to the defendant. *Id.* at 530.   As demonstrated below, the analysis of these four factors clearly demonstrates that Martin's constitutional right to a speedy trial has been violated.

### 1.  Length of Delay

The first factor, length of delay, requires a double inquiry. *Doggett*, *supra* at 651.   The first inquiry serves as a "triggering mechanism," the satisfaction of which triggers inquiry into the remaining factors. *Barker*, 407 U.S. at 530.  Before a court inquires into the other three factors, "an accused must allege that the interval of time between the accusation and trial has crossed the threshold dividing

ordinary from presumptively prejudicial delay." *U.S. v. Ingram*, 446 F.3d 1332, 1336 (11th Cir. 2006). It is well established that delays exceeding one (1) year are "presumptively prejudicial" and thus, trigger a full *Barker* analysis. *See Ingram*, 446 F.3d at 1336; *see also United States v. Utsick*, 2016 WL 3074316 at *4 (S.D. Fla. June 1, 2016).

When the speedy trial analysis is triggered, it is appropriate to consider an inordinate *pre*-indictment delay in determining how heavily post-indictment delay weighs against the Government. *See Ingram*, 446 F.3d at 1339; *see also United States v. Marion*, 404 U.S. 307, 211 (1971) ("The impairment of the ability to defend oneself may become acute because of delays in the pre-indictment stage . . . [due to] the loss of alibi witnesses, the destruction of material evidence, and the blurring of memories."); *United States v. Vispi*, 545 F.2d 328, 333 (2d Cir. 1976) (delay between Government's discovery of the offense and filing of the information was relevant in assessing whether post-information delay was intolerably long); *United States v. Velez*, Case No. 05-20770, Docket Entry 222 at 6 (S.D. Fla. Feb. 13, 2009) (post-indictment delay weighed more heavily against Government than it otherwise would because of significant pre-indictment delay).

### a. First Inquiry: Triggering Mechanism

In this case, because the delay between the accusation and trial exceeds one (1) year, it has crossed the threshold dividing ordinary from presumptively

prejudicial delay, and a full *Barker* analysis is triggered. *Ingram*, *supra* at 1336. The pre-indictment delay is almost six (6) years, because the First Indictment was in 2011 and it is now 2017.   Moreover, even if pre-indictment delay were not considered, it has been two (2) years since the Second Indictment was returned in April 2015.   Therefore, the delay is presumptively prejudicial and a full *Barker* analysis is triggered.

### c. Second Inquiry: Weight of the Length of the Delay

The second part of the double inquiry is how heavily the length of delay weighs against the Government.  Here, the length of delay weighs heavily against the Government for a variety of reasons.

*First*, since the Government associated Martin with the Hurtado Organization when the First Indictment was returned in 2011, the length of delay to consider is the almost six (6) years since that indictment.  Without question, a six (6) year delay is extraordinary and weighs heavily against the Government. *See e.g., Barker*, 407 U.S. at 533 (delay of over five years was "extraordinary").

*Second,* while it is clear that the post-indictment period in this case begins with the First Indictment in 2011, even if it began with the Second Indictment in April 2015, the length of delay remains extraordinary.  As the Eleventh Circuit explained in *Ingram*, while only the length of the post-indictment delay is to be considered in whether the delay satisfies the 'triggering mechanism,' "once the

Sixth Amendment's speedy trial analysis is triggered, it is appropriate to consider inordinate pre-indictment delay in determining how heavily post-indictment delay weighs against the government. *Ingram*, 446 F.3d at 1339. Thus, when determining the weight against the Government of the delay, this Court should consider the inordinate length of the *pre*-indictment delay. Here, the indictment explicitly indicates that the alleged conspiracy ended in 2010. However, the Second Indictment in April 2015 was not returned until approximately five (5) years after the alleged crime ended.

The rationale for presuming prejudice is that excessive delay presumptively compromises the reliability of a trial in ways that the party cannot prove or—for that matter—identify. *Ingram*, 446 F.3d at 1339 (citing *Doggett*, 505 U.S. at 655). Therefore, the two (2) year delay in this case since the Second Indictment weighs more heavily than it would in another case where the post-indictment delay began shortly after the alleged criminal acts occurred. Because the Second Indictment is based on the First Indictment, it is based on an alleged crime that began seventeen (17) years ago, ended seven (7) years ago, and sat dormant for five (5) years before being filed. Even after the Second Indictment was filed, the Government has still waited over two (2) years—and counting—without any attempt to bring Martin to trial.

This unnecessary delay has resulted in several harms to Martin, including, but not limited to, those specified in *Doggett*, 505 U.S. at 654, such as the looming anxiety he experienced immediately after becoming aware of the ongoing investigation against him, as well as the likelihood that his defense will be impaired by dimming memories and loss of exculpatory evidence.

Furthermore, because the delay in this case encompasses a significant post-indictment period, this is not a situation where, after an offense was committed, the Government needed months to investigate the identity or complicity of the defendants in the alleged illegal conduct.  Nor did the Government need time to investigate whether a crime was committed.   Therefore, much as the pre-indictment delay in *Ingram* compounded the prejudicial effect of the post-indictment delay, the pre-indictment delay in this case compounds the prejudicial effect of the post-indictment delay.  Simply put, the length of delay between the time of the alleged conspiracy, the First Indictment in 2011, the Second Indictment in 2015, and the time of this motion, weighs heavily against the Government.

## 2.  <u>Reason for Delay</u>

The second *Barker* factor "is the reason the Government assigns to justify the delay." *Barker*, 407 U.S. at 531.  It is well established that, "[t]he Government has a duty to make a diligent, good faith effort to bring an indicted defendant to trial promptly." *United States. v. Hayes*, 40 F.3d 362, 365 (11th Cir. 1994); *see*

*also United States v. Heshelman*, 521 Fed. Appx. 501, 507 (6th Cir. 2013).  In the case of a foreign defendant, the Government can satisfy its diligent pursuit obligation by seeking extradition of the defendant. *See Hayes,* 40 F.3d at 365.  The Government may be excused from seeking extradition only when this effort would be completely futile. *See Heshelman,* 521 Fed. Appx. at 507.

The burden is on the prosecution to explain the cause of pretrial delay. *See Ingram*, 446 F.3d at 1337.  The Court in *Barker* made clear that "different weights should be assigned to different reasons" for delay. *Barker,* 407 U.S. at 531. Specifically, intentional delay, such as a "deliberate attempt to delay the trial in order to hamper the defense," should be weighed more heavily against the Government than negligent delay. *Id.*  While negligent delay, such as failure to investigate the whereabouts of the defendant, is weighed less heavily, it "nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government[.]" *Id.*  As multiple courts have pointed out, "[n]egligence still falls on the wrong side of the divide between acceptable and unacceptable reasons for delaying a criminal prosecution." *United States v. Velazquez*, 749 F.3d 161, 175 (3d Cir. 2013) (citing *Doggett*, 505 U.S. at 657 (Brennan, J., concurring)).

In assessing the reason for delay, "the Court must consider whether the Government or the Defendant is more responsible for the delay." *United States v.*

*Ospina*, 485 F. Supp. 2d 1347, 1360 (S.D. Fla. 2007).  Only where a defendant intentionally evades detection should the reason for the delay be weighed against the defendant. *See Ingram*, 446 F.3d at 1337.  Indeed, in the absence of any fault attributable to the defendant, the delay must be caused *entirely* by the Government. *Id.* at 1338. Moreover, if a defendant is unaware of the indictment, the Government's burden to locate the defendant is higher. *Heshelman,* 521 Fed. Appx. at 506. The Government does not shed this burden merely because the defendant is in a foreign country. *Id.*  Similarly, "a person under investigation for a crime in the United States is not transformed into a fugitive solely on the basis of his or her residence in a foreign jurisdiction or country." *Id.* at 509.

### a.  Failure to Extradite Martin from Venezuela

The Government failed to meet its burden to make reasonable efforts to extradite Martin from Venezuela, thus making the reason for the delay unacceptable and weighing heavily against the Government.

In *Heshelman*, the defendant was indicted on charges of conspiracy, wire fraud, and money laundering. *Heshelman*, 501 Fed. Appx. at 503.   The Government learned of defendant's address and telephone number in Switzerland from the Swiss government, but did not pursue extradition, despite the existence of an extradition treaty. *Id.*  The Government claimed it was concerned that it would be difficult to convince Swiss authorities to extradite the defendant on the money

laundering charge due to the severity of the punishment. *See id* at 503-504.

The Government further argued that the defendant was responsible for the delay because he was a fugitive evading prosecution. *Id* at 509. The Sixth Circuit rejected that argument, because merely living in a foreign jurisdiction while under investigation in the U.S. does not make one a fugitive. *Cf. Heshelman*, 521 Fed. Appx. at 509 (defendant not a fugitive where he lived in Switzerland periodically before any investigation and at time of indictment), *and Ospina*, 485 F. Supp. 2d at 1360 (defendant not a fugitive where he did not flee to Colombia, but was involuntarily deported there), *with United States v. Cadet* 521 F. Supp. 2d 1351, 1355 (S.D. Fla. 2007) (reason for delay did not weigh heavily against Government where U.S. citizen voluntarily fled to Haiti after learning of forthcoming charges).

The *Heshelman* court found that despite the absence of any indication that the Swiss Government would not extradite the defendant, the Government "still chose to intentionally delay pursuing [defendant's] arrest and ensure absolute control over the charges brought against him . . . [which] allowed the government to obtain a more severe penalty upon conviction." *Id*. This type of delay weighed heavily against the Government. *Id*.

Here, as in *Heshelman*, Martin is not a fugitive simply because of his residency outside the U.S. In fact, the Government knew from its initial investigation that Martin resided in Venezuela. He was living openly under his

own name.  Because the indictment was sealed, Martin obviously was not eluding law enforcement.  He was unaware that he was the subject of law enforcement attention prior to his self-surrender.

Moreover, Martin did not intentionally evade the Government's efforts to bring him to trial.  It was the Government that waived its opportunity to extradite him by ignoring the Venezuelan authorities' notice that it had sixty (60) days to file for formal extradition.  Further, Martin's actions are inconsistent with evasion. On August 26, 2015, when he learned about the indictment, and the Red Notice, he voluntarily surrendered to Interpol.  The delay here was *entirely* due to the Government's actions and inactions, not Martin's.  Therefore, the Government's classification and public listing of him as a fugitive is erroneous and contrary to both the practical and legal understandings of that term.

Additionally, the Government intentionally delayed Martin's prosecution. While Interpol and the Venezuelan authorities complied with their duties, the Government did not.  Pursuant to Venezuelan law, under the Código Orgánica Procesal Penal ("COPP")*, and Article 87 of INTERPOL'S Rules on the Processing of Data, (INTERPOL'S Rules on the Processing of Data, INTERPOL, Nov. 4, 2016, Art. 87, *available at https://www.interpol.int/About-INTERPOL/Legal-materials*), and the text of the Red Notice itself, upon Martin's surrender to Interpol, he was taken into preventative detention on August 26, 2015.  The case

was sent to the Supreme Court of Justice, and on October 2, 2015, the U.S. was notified that it had sixty (60) days to submit the formal request for extradition and judicial documentation, as required by COPP Articles 395 and 396, as well as the 1922 extradition treaty signed between the U.S. and Venezuela. *Treaty, and Additional Article, Between the United States and Venezuela for Extradition of Fugitives From Justice*, U.S.-Venez., Art. XII, Jan. 19, 1922, 42 Stat. 1698 (hereinafter "1922 Treaty"). On January 21, 2016—one-hundred and eleven (111) days after the U.S. was notified of the sixty (60) requirement—the Supreme Court of Justice ordered the release and cessation of the detention order for Martin, pursuant to COPP Article 397 and Article XII of the 1922 Treaty. (Exhibit "F" at 3). The court based its ruling on the United States' "formal and manifest disinterest in the extradition request," as shown by the Government's disclosure to the Venezuelan Consulate that it did not intend to file a formal request (Exhibit "F" at 3).

The U.S. Government failed to meet its obligations under its own policies and international agreements. Article 84 of *INTERPOL'S Rules on the Processing of Data* explicitly requires that a Red Notice be issued only if "assurances have been given that extradition will be sought upon arrest of the person." The Government is aware of § 611 of the *Criminal Resource Manual*, issued by the United States Attorney's Office, which cautions that that "if a Red Notice is issued,

the prosecutor's office is obligated to do whatever work is required to produce the necessary extradition documents within the time limits prescribed by the controlling extradition treaty whenever and wherever the fugitive is arrested." DEP'T OF JUSTICE, U.S. ATTORNEYS' MANUAL: CRIMINAL RESOURCE MANUAL § 611 (2012), *available at* https://www.justice.gov/usam/criminal-resource-manual-611-interpol-red-notices.  Moreover, the text of the Red Notice for Martin affirms that the Government purported to follow this obligation, stating: "The country at the request of which the present notice has been published has given assurances that extradition will be sought upon arrest of the person, in conformity with its national laws and/or the bilateral and multilateral treaties."[1] When the U.S. issued the Red Notice, it made assurances that extradition would be pursued, but failed to make good on that obligation.

The Government's failure to file a formal request for extradition in sixty (60) days was not due to an act of negligence (which, itself, would be a violation); rather, the Government affirmatively expressed its *disinterest* in filing that request. Consequently, the Government's own actions demonstrate that it intentionally delayed Martin's prosecution for no legitimate reason.  These actions amount to more than negligence. The Government's failure to take affirmative steps to extradite Martin was, and remains, intentionally unjustified.

---

[1] The pronoun "its" refers to the country requesting extradition, which was the U.S.

The Government may assert that it failed to seek extradition from Venezuela because such efforts would be futile due to Venezuela's constitutional policy against extraditing its citizens. *See United States v. Bagga*, 782 F.2d 1541, 1543-44 (11th Cir. 1986).  However, this case is distinct from *Bagga*.  There, the extradition treaty between the U.S. and India did not cover the crime charged. *Bagga*, 782 F.2d at 1543.  More importantly, the Government knew only that the defendant was in India; it had no more specific knowledge. *Id.* at 1543-44.  Because there was little chance of securing extradition, the Government's duty to make "good faith efforts" to return the defendant to the U.S. did not require it to pursue unlikely means to locate the defendant within India to begin attempts at extradition. *Id.*

Here, despite Venezuela's constitutional prohibition on extraditing its citizens, Venezuela is a signatory to the 1988 United Nations Drug Convention (hereinafter "UN Drug Convention"), under which many narcotics offenses are covered.   Article six (6) section (2) of the UN Drug Convention states:  "[e]ach of the offenses to which this article applies shall be deemed to be included as an extraditable offense in any extradition treaty existing between Parties." Article three (3) section one (1) explicitly includes as extraditable offenses "the organization, management, or financing" of the "distribution, sale, delivery on any terms whatsoever . . . transport, importation, or exportation of any narcotic drug," as well as the possession of any narcotic drug for such purposes.   Moreover,

Article three (3) section (1) subsection (c) specifies that "participation in, association or conspiracy to commit" such offenses fall within the purview of extraditable offenses under the UN Drug Convention. Thus, the offenses with which Martin has been charged fall under the scope of the UN Drug Convention, and are extraditable.

Additionally, here, the logistical problems faced in *Bagga* are not present. Not only did the Government know that Martin had surrendered to authorities, but the Government was given formal notice by Venezuelan authorities that it had sixty (60) days to submit its formal request for extradition, and failed to do so. The good faith efforts required of the Government to pursue extradition in *Bagga* far exceed those required in this case. Whereas in *Bagga,* the Government would have needed to first expend time and resources on locating the defendant—that were unlikely to succeed in the first place—here, the Government needed to simply respond to the Venezuelan authorities' notice by submitting a formal request for extradition. Moreover, unlike *Bagga*, where the Government's failure to pursue extradition threatened only its obligations under the Sixth Amendment, here the Government had an obligation to both Interpol and Venezuela to follow through with its assurances that the U.S. would seek extradition upon Martin's detention. It is no defense that the Red Notice specifies that extradition will be sought in conformity with national laws, because a plain reading of the language reveals that

the laws in question are those of the nation seeking extradition: the United States—not Venezuela.

A conscious failure to comply with these assurances, which are a prerequisite to the issuance of a Red Notice, is, by its very nature, evidence of bad faith.  Even if the likelihood of securing Martin's extradition from Venezuela was low, the Government's affirmative reply to the Venezuelan authorities that it would not submit a formal extradition request surely falls short of making a "good faith effort" to pursue extradition.

The Government may also argue that it did not seek extradition because Venezuela would condition its surrender of Martin upon an assurance that the U.S. would not seek life imprisonment, pursuant to Article IV of the 1922 Treaty. Martin's indictment carries a maximum punishment of life in prison.  As in *Heshelman*, it is likely that the Government did not want to lose this bargaining chip against Martin. Therefore, it would have been more beneficial for the Government to obtain extradition of Martin from a different country.  This is consistent with the Government's use of a Red Notice instead of a direct extradition from Venezuela, and its refusal to file formal extradition upon Martin's apprehension in Venezuela.

However, when the government "intentionally delays the trial to gain some sort of tactical advantage over the defendant, that is 'weighted heavily against the

government.'" *Heshelman*, 521 Fed. Appx at 506 (quoting *Barker*, 407 U.S. at 531). While the government is not faulted for wanting to try a defendant on all charges in the indictment, a "willingness to wait for an indefinite period of time" violates the Sixth Amendment. *Id.* Here, the Government's refusal to comply with its obligations indicate its unwillingness to take the risk that Venezuela would extradite Martin only with assurance that he would not face life imprisonment.

Analogous to *Heshelman*, the Government in this case had the opportunity to secure Martin's presence for trial based upon a valid extradition treaty with Venezuela, but refused to seek extradition, ostensibly in the hopes of securing his extradition through another jurisdiction and being able to seek more severe penalties. The Government's failure to make a diligent, good faith effort to bring him before this Court for trial is an inexcusable derogation of its constitutional duty, as well as the duty it undertakes when seeking issuance of a Red Notice. Because the Government affirmatively refused to seek extradition, its failure to seek Martin's extradition from Venezuela was intentional. As such, the reason for the delay weighs exceedingly heavily *against* the Government.

Finally, even if the Government's failure to comply with its obligations under the Red Notice, by showing its "manifest and formal disinterest" in seeking extradition, were somehow not intentional, the reason for the delay would still weigh heavily against the Government for several reasons. First, the length of the

delay calls for a presumption of negligence on the Government's part. *See, e.g., United States v. Toma*, 869 F. Supp. 2d 1315, 1321 (D. Kan. 2012) ("…where the government delays a prosecution for half a decade or longer, the burden is on the government to persuasively rebut a presumption of negligence." (citations omitted)).  Second, even where the government's lethargy might reflect "no more than [the defendant's] relative unimportance in the world of drug trafficking," it is still negligent. *Doggett*, 505 U.S. at 563.  Third, the more glaring the government's negligence, the more heavily it weighs against it.

Here, the Government's failure to comply with the assurances it gave when it sought the Red Notice, even absent intentionality, would weigh heavily against it.  Because of the delay of nearly six (6) years between the First Indictment in 2011 and this motion, Government negligence should be presumed, unless persuasively rebutted.  Most importantly, the Government's failure to meet its duties under *INTERPOL'S Rules for the Processing of Data*—particularly in light of the complete cooperation of the Venezuelan authorities—rises above ordinary negligence, demonstrating a blatant disregard for making a "good faith" effort to seek extradition.  In *United States v. Toma*, the court found the Government to be negligent, explaining that the defendant "did not slip through the government's grasp, [as] there was no grasp to slip through." *Toma*, 869 F. Supp. 2d at 1320.

Here, in presenting himself to Interpol and Venezuelan authorities, Martin *placed* himself in the hands of the Government. By failing to file a formal request for extradition, the Government refused to even attempt to close its hands. Accordingly, the reason for delay must weigh heavily against the Government.

### b. Failure to Extradite Martin from Other Countries

Even if the Government could somehow overcome its failure to extradite Martin from Venezuela (which is denied), it also failed to satisfy its burden to make reasonable efforts to bring him to the U.S. during his many trips outside that country. Surprisingly, despite numerous opportunities, the Government failed to have Martin detained and extradited from other countries—including those with liberal extradition policies regarding Venezuelan nationals. Martin made two (2) flights to Panama between 2012 and 2015 and sixteen (16) flights to the Aruba Island during the same period. Below is a chart listing his flights with the corresponding page on which his passport was stamped:

| TRAVEL DATES | ITINERARY | PASSPORT PAGE NUMBER |
|---|---|---|
| APR 27, 2012 | CARACAS – ARUBA | 5, 7 |
| MAY 10, 2012 | ARUBA - CARACAS | 7, 5 |
| JUN 08, 2012 | CARACAS - ARUBA | 5, 4 |

| JUN 12, 2012 | ARUBA - CARACAS | 4, 5 |
|---|---|---|
| JUL 30, 2012 | CARACAS – ARUBA | 4, 7 |
| SEPT 03, 2012 | ARUBA - CARACAS | 7, 4 |
| OCT 09, 2012 | CARACAS – ARUBA | 6, 7 |
| OCT 13, 2012 | ARUBA - CARACAS | 7, 6 |
| OCT 18, 2012 | CARACAS – TOCUMEN, PANAMA | 6, 6 |
| OCT 22, 2012 | PANAMA - CARACAS | 8 |
| DEC 02, 2012 | CARACAS – TOCUMEN, PANAMA | 7 |
| DEC 03, 2012 | PANAMA - CARACAS | 8 |
| DEC 19, 2012 | CARACAS – ARUBA | 8 |
| JAN 11, 2013 | ARUBA - CARACAS | 9, 4 |
| JAN 25, 2013 | CARACAS – ARUBA | 9, 16 |
| JAN 27, 2013 | ARUBA - CARACAS | 16, 9 |
| MAR 01, 2013 | CARACAS – ARUBA | 9, 10 |
| MAR 03, 2013 | ARUBA – CARACAS | 10, 9 |

| | | |
|---|---|---|
| **MAR 24, 2013** | CARACAS-ARUBA | 10, 10 |
| **APR 05, 2013** | ARUBA - CARACAS | 10, 11 |
| **MAY 14, 2013** | CARACAS – ARUBA | 11, 16 |
| **MAY 19, 2013** | ARUBA - CARACAS | 16, 12 |
| **JUN 06, 2013** | CARACAS – ARUBA | 11, 12 |
| **JUN 11, 2013** | ARUBA - CARACAS | 12 |
| **SEPT 04, 2013** | CARACAS – ARUBA | 12 |
| **OCT 04, 2013** | ARUBA - CARACAS | 12 |
| **JAN 08, 2014** | CARACAS – ARUBA | 12 |
| **JAN 17, 2014** | ARUBA - CARACAS | 12, 13 |
| **FEB 13, 2014** | CARACAS – ARUBA | 13 |
| **MAR 04, 2014** | ARUBA - CARACAS | 13 |
| **APR 04, 2014** | CARACAS – ARUBA | 8, 14 |
| **APR 25, 2014** | ARUBA - CARACAS | 14, 13 |
| **JUL 06, 2014** | CARACAS – ARUBA | 14 |
| **JUL 22, 2014** | ARUBA - CARACAS | 14 |

| OCT 02, 2014 | CARACAS – ARUBA | 15 |
|---|---|---|
| OCT 11, 2014 | ARUBA - CARACAS | 15, 11 |

Even assuming *arguendo* that the Government met its burden of making reasonable efforts to extradite Martin from Venezuela, the same cannot be said regarding Panama.  If the Government had taken steps to pursue alternatives to Venezuelan extradition—such as prompt issuance of a Red Notice—Martin would have been arrested in Panama.  He traveled there on October 18, 2012 and December 2, 2012; yet, the Government made no effort to have him arrested there. The U.S. Department of State's International Extradition Report, *supra*, states: "Panama is a party to the 1988 United Nations Drug Convention, through which narcotics trafficking and related money laundering are deemed to be included as extraditable offenses under the bilateral extradition treaty."  The Report also states: "Panama has continually demonstrated good faith efforts to surrender fugitives to the United States.  Most of all, Panama has shown a willingness on numerous occasions to make use of legal alternatives to extradition ... to effect the return on non-Panamanians to the United States to face trial."

The Government's failure to attempt to bring Martin from Panama to the U.S. to face trial is especially apparent given the DEA's knowledge, in real time, not only that Martin was in Panama, but his exact location.  The DEA knew where

he was conducting business and where he was staying, but made no attempt to bring him under the jurisdiction of the U.S. Panama would have allowed his extradition if the Government taken affirmative action while he was there.

The government is negligent when it does not make a "serious effort" to find a defendant. *Velazquez*, 749 F.3d at 180. By making *no* effort to apprehend Martin while DEA agents in Panama knew of his precise location, the Government's failure to bring Martin to the U.S. for trial was not merely negligent – it evidences an intentional decision not to pursue his extradition.

If the Government had taken timely and reasonable actions to pursue an arrest, the U.S. would not have faced substantial obstacles to extradition upon arrest. First, the Panamanian policy not to extradite its own citizens would not have applied to Martin. Second, the Panamanian government has shown a demonstrated willingness to surrender fugitives to the U.S. through extradition and other means. The Government's failure to issue a Red Notice, or pursue other means to apprehend Martin during his travels to Panama following the First Indictment in 2011 resulted in the missed opportunity to extradite him from Panama. Had the Government made such reasonable efforts, he would have been brought into the jurisdiction of the U.S. and any potential obstacles to extradition from Venezuela would have been rendered moot.

Similarly, the Government made no effort to extradite Martin from Aruba during his many visits there between April, 2012 and October, 2014. Even though he traveled there sixteen (16) times, the Government never once attempted to have him arrested while in Aruban territory. While Aruba's status as a constituent country within the Kingdom of the Netherlands prohibits it from signing international treaties on its own, the Netherlands extends its treaties to Aruba. The extradition treaty between the U.S. and the Netherlands specifies that the treaty will apply to the territory of the Kingdom in Europe and (what was then officially) the Netherlands Antilles. 35 U.S.T. 1334 (Dec. 22, 1979). This treaty explicitly covers "offenses against the laws relating to the traffic in, or the possession, production or manufacture of narcotic drugs … cocaine and its derivatives." The 2016 *International Narcotics Control Strategy Report* issued by the U.S. Department of State confirms that the Netherlands extended to Aruba various United Nations Drug Conventions, including the 1988 UN Drug Convention. United States Department of State, 1 *2016 International Narcotics Control Strategy Report*: *Drug and Chemical Control*, 149-51 (2016). Thus, it is beyond peradventure that the U.S. could pursue extradition from Aruba for the offenses with which Mr. Martin has been charged.

Just as in Panama, the Government's failure to extradite Martin from Aruba is the result of its failure to make reasonable efforts to arrest him following the

First Indictment in 2011.  Had the Government issued the Red Notice promptly—
or even within three (3) years of the First Indictment—Martin would have been
arrested in Aruba on one of the sixteen (16) trips he made there between April,
2012 and October, 2014.  As with Panama, had the Government's efforts, through
a Red Notice or otherwise, led to the arrest of Martin in Aruba, the Government
would not have faced any structural obstacles to extradition.    Thus, the
Government's failure to arrest and extradite Martin on one of his numerous trips to
Aruba was the result of its failure to take reasonable steps to bring him within the
jurisdiction of the United States.

Even if the Government had taken sufficient steps to secure Martin's
extradition from Venezuela, there were multiple opportunities to avoid the need to
seek extradition from Venezuela altogether.  The Government had ample
opportunity to have Mr. Martin detained, arrested, and extradited while he was
outside of Venezuela on eighteen (18) different occasions between April, 2012 and
October, 2014, after the issuance of the First Indictment in 2011.  Instead, the
Government made no effort to apprehend Martin.  Had the Government made a
good-faith effort to seek extradition to the U.S., such as by the prompt issuance of
the Red Notice, it would have obtained jurisdiction over Martin from nations more
likely to surrender a Venezuelan citizen, than Venezuela itself would be.

Here, as in *Ingram*, the utter failure to take any action to bring the defendant under the jurisdiction of the U.S. must weigh more heavily against the Government than ordinary negligence.  Because the Government had an opportunity to seek to obtain jurisdiction over Mr. Martin when it knew his exact whereabouts in Panama, the Government's actions rise above negligence, and recklessness, because they were intentional.

### c. The Reason for Delay Weighs Heavily Against the Government

The Government has not offered any legitimate reason for the six (6) year delay between the end of the alleged criminal conspiracy and the Government's continued failure to bring Martin to trial.  In sum, the delay here is not only extensive, but intentional.  The Government deliberately chose to infringe on Martin's Sixth Amendment right to a speedy trial for no legitimate reason.  Martin has not evaded arrest in any way—and in fact surrendered himself to Venezuelan authorities.  The reason for the delay weighs *only* against the Government.

### 3.  <u>Martin's Assertion of His Right to a Speedy Trial</u>

The third *Barker* factor considers a defendant's duty to assert his right to a speedy trial. *Barker*, 407 U.S. at 531.  A defendant who fails to affirmatively assert this right has a hard time proving a violation of the right. *Id.* at 532.  However, a defendant who is unaware of the charges against him is excused from failing to assert this right. *See Doggett*, 505 U.S. at 652-54.

Here, Martin duly asserted his constitutional right to speedy trial. When he became aware of the Red Notice issued for him, Martin immediately and autonomously surrendered himself to Interpol, evidencing his desire for a prompt and just resolution of the matter. In fact, Martin surrendered himself in response to the Red Notice *before* the indictment against him was unsealed. Here, as in *Doggett*, any failure to assert the right to a speedy trial cannot be held against Martin where he was unaware of the charges.

Prior to his voluntary surrender to the Venezuelan authorities, Martin had absolutely no knowledge of the charges against him. Thus, assertion of his right to a speedy trial was timely. Given Martin's extraordinary effort in turning himself in and alleviating the Government of its burden in locating him, this factor also should weigh heavily against the Government.

### 4.  <u>The Prejudice to Martin</u>

The fourth and final *Barker* factor requires analysis of prejudice to the defendant. *Barker*, 407 U.S. at 532. The Supreme Court has identified three types of prejudice to the accused that the speedy trial right was designed to protect against: (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired. *Id*. In *Doggett*, however, the Court acknowledged that "affirmative proof of particularized prejudice is not essential to every speedy trial claim."

*Doggett*, 505 U.S. at 655. This is based on the reality that "impairment of one's defense is the most difficult form of speedy trial prejudice to prove because time's erosion of exculpatory evidence and testimony can rarely be shown." *Id.* at 655. Thus, the Court eased the requirements of affirmative proof of prejudice, instead recognizing that "excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify." *Id.*

The Eleventh Circuit has repeatedly held that if the first three *Barker* factors weigh heavily against the Government, the defendant need not prove the fourth factor—actual prejudice—to succeed on a claim that his Sixth Amendment right to a speedy trial was violated. *E.g., Ingram*, 446 F.3d at 1336 (citing *Doggett*, 505 U.S. at 647). Rather, where all three factors weigh heavily against the government, the presumption of prejudice will suffice. *See*, *e.g.*, *Ingram* 446 F.3d at 1336 (citing *Doggett*, 505 U.S. 647); *United States v. Ospina*, 485 F. Supp. 2d 1357, 1361 (S.D. Fla. Feb. 13, 2009) (because the first three *Barker* factors all weighed heavily against the government, defendant did not need to demonstrate actual prejudice from the delay); *Velez*, Case No. 05-20770, Docket Entry 222, at 12 (indictment dismissed without affirmative showing of prejudice based on length of delay and aggregate weight of *Barker* factors).

Given the inordinate length of delay in this case, prejudice must be presumed. The gap of nearly six (6) years between the First Indictment in 2011

and this motion is extraordinary.[2] Additionally, the reason for the Government's delay weighs heavily due to the Government's extreme unwillingness and inability to even attempt to obtain jurisdiction over Martin, whether from Venezuela, Aruba, or Panama. Lastly, Martin's timely assertion of his speedy trial right weighs heavily in his favor. Thus, all three of the preliminary *Barker* factors weigh heavily *against* the Government. As such, no showing of prejudice is required.

Nevertheless, some of the prejudice Martin will suffer in the event of a trial is already apparent. For example, the Government's intentional and lengthy delay in bringing him to trial has provided it with a significant tactical advantage. The Government gathered sufficient evidence to secure a grand jury indictment of Martin in July 2011 and April 2015, but has failed to bring him before this Court to answer for the charges against him. At trial, he would be forced to go back in time, from January 2000 to September 2010, to search for witnesses and evidence necessary for his defense. This is precisely the scenario contemplated by *Doggett*,

---

[2] Even if the relevant tolling period did not begin until the Second Indictment in April 2015, the two (2) year delay is quite different from the seventeen (17) month delay in *United States v. Clark*, 83 F.3d 1350 (11th Cir. 1996). As *Ingram* confirms "there is no hard and fast rule to apply here, and each case must be decided on its own facts." *Id.* at 1338 (citing *Clark*, 83 F.3d at 1354). This case is different from *Clark* in two respects. First, the five-year delay between the end of the alleged conspiracy and the Second Indictment is considered when weighing the length of delay (*see, e.g. Marion*, 404 U.S. at 330-31) and is dramatically longer than in *Clark*. *Id.* at 1352. Second, as in *Ingram* (446 F.3d at 1339), the Government's conduct rises well above the ordinary negligence in *Clark* (83 F.3d at 1352-53).

and other courts, which have found that the magnitude of delay impairs not only the ability to put forth a defense, but also the ability to affirmatively show prejudice—the "most difficult form of speedy trial prejudice to prove." *Doggett*, 505 U.S. at 655 (citing *Barker*, 407 U.S. at 532).   Martin's ability to defend himself is severely prejudiced given the likelihood that witnesses and evidence will be unidentifiable and unavailable after all these years.

Moreover, Martin was subject to pre-trial restrictions for over four months as he awaited extradition. As recognized by the Supreme Court in *Barker*, time spent with one's liberty curtailed while awaiting a trial has a detrimental impact on an individual. *Barker*, 407 U.S. at 532-33.   The only basis for Martin's freedom being restricted was the Red Notice issued at the United States' request.   Thus, Martin was unnecessarily constrained of his liberty, because the U.S. had no intention of filing a formal extradition.

Finally, on January 6, 2016, after spending more than four months with his freedom restricted, the Venezuelan courts ordered his release, stating: "it is clear that the United States of America's Government's judiciay [sic] expresses a formal and manifest disinterest in the extradition request."   Thus, Martin was substantially prejudiced by being unreasonably held in limbo and deprived of his liberty for more than four months when the Government had no intention of extraditing him.

Lastly, Martin has lived under a cloud of suspicion and has suffered from anxiety since his release from pre-trial incarceration. His classification by the Government as a fugitive—which is inaccurate because he never evaded the charges, and, in fact, turned himself in to Venezuelan authorities—has caused him public humiliation and harmed his business. This erroneous designation is especially harmful, because it is posted publicly on the DEA's website.  This inaccurate, public pronouncement is embarrassing, demeaning, and has had a crippling impact on Martin's business.  In addition, resulting stress and anxiety have taken a significant toll on his physical and mental health.  Unsurprisingly, since August of 2015—the month in which Mr. Martin voluntarily surrendered himself to Venezuelan authorities—the constant anxiety of awaiting a trial has resulted in the presentation of criteria for anxiety and depression (Exhibit "E"). To treat these conditions, he requires daily medication (Exhibit "E").

The unrelenting stress of indefinitely awaiting a trial has also taken its toll on Martin physically.  Despite his clean bill of health prior to August 2015, Martin required emergency medical attention on two occasions that month (Exhibit "E"). During the first health crisis, he had a blood pressure of 165/100 mm Hg, and blood glucose levels of 298 mg/dl, both of which are dangerously high.  He also was diagnosed with Type 2 Diabetes mellitus, which has worsened with time as he continues to await trial. *See* Ex. I.

On August 26, 2015, Mr. Martin once again needed emergency medical attention for hypertension and hyperglycemia (Exhibit "E"). His current control remains difficult to achieve; hypertensive crises and glucose decompensations persist (Exhibit "E"). Even as Martin receives medical treatment, it continues to become more intensive—even requiring insulin injections (Exhibit "E"). He currently requires seven medications daily to attempt to achieve a semblance of cardio metabolic control (Exhibit "E"). Even so, his medical visits are characterized by glucose elevations and rises in blood pressure, and has not been "optimal" since August of 2015 (Exhibit "E").

In addition to the adverse health effects, because the Government has not withdrawn the Red Notice issued for him, and has taken no action to obtain jurisdiction over him, Martin remains in an unrelenting state of uncertainty and chaos. He is publicly and erroneously pronounced a fugitive, is unable to travel outside the country, and awaits indefinitely for a trial with no indication it will occur anytime soon.

Even though Martin has ample evidence of implicit prejudice to satisfy the fourth *Barker* factor, because the first three *Barker* factors all weigh heavily against the Government, he need not demonstrate actual prejudice from the delay. Given the weight of the *Barker* factors, Martin's Sixth Amendment speedy trial right has been violated and warrants an immediate dismissal of the indictment.

### III.  <u>CONCLUSION</u>

For the foregoing reasons, the Defendant, Pedro Luis Martin Olivares, respectfully requests that this Honorable Court dismiss the indictment with prejudice based upon the Government's violation of his Sixth Amendment right to a speedy trial, or, alternatively, that it order an evidentiary hearing of this motion.

Dated: May 4th, 2017                                    Respectfully submitted,

David W. Macey, Esq.
Law Offices of David W. Macey, P.A.
135 San Lorenzo Avenue, PH-830
Coral Gables, Florida 33146
Telephone: (305) 860-2562
Fax: (305) 675-5841
Email: <u>dm@davidmacey.com</u>

### <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on May 4th, 2017 the undersigned electronically filed the foregoing documents with the Clerk using CM/ECF.

By: *<u>s/ David W. Macey</u>*
David W. Macey, Esq.
Florida Bar No.: 185612

# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. **11-20478**-CR-COOKE

21 U.S.C. §963
21 U.S.C. §959(a)(1)
21 U.S.C. §959(b)(2)
21 U.S.C. §853
18 U.S.C. §1956(h)
18 U.S.C. §1956(a)(3)(A)
18 U.S.C. §1952
18 U.S.C. §1544

MAGISTRATE JUDGE
TURNOFF

UNITED STATES OF AMERICA

vs.

ROBERTO MENDEZ-HURTADO,
ALVARO RICARDO NINO-BONILLA,
        a/k/a "Lucas,"
        a/k/a "Mono,"
ROBERTO HARRIGAN,
        a/k/a "Tico,"
SAMUEL JAVIER,
JORGE IVAN RIVEROS,
LUIS FERNANDO VELASQUEZ-RAMIREZ,
NARCISO RONDON-MEJIA,
SEVERO CONFESSOR,
EARL DELVILLE HODGE
        a/k/a, "Bob Hodge,"
JUAN FIGUEROA-VALDEZ,
CARLSTON BEAZER,
CHAD SKELTON,
and
HUMBERTO GALLEGO,

        Defendants.

_____/

FILED by _____ D.C.

JUL 15 2011

STEVEN M. LARIMORE
CLERK U. S. DIST. CT
S. D. of FLA. – MIAMI

**INDICTMENT**

The Grand Jury charges that:

## COUNT 1

From in or around March 2009, through the date of the return of this indictment, the exact

dates being unknown to the Grand Jury, in Miami-Dade County, in the Southern District of Florida,

and elsewhere, the defendants,

**ROBERTO MENDEZ-HURTADO,**
**ALVARO RICARDO NINO-BONILLA,**
**a/k/a "Lucas,"**
**a/k/a "Mono,"**
**ROBERTO HARRIGAN,**
**a/k/a "Tico,"**
**SAMUEL JAVIER,**
**JORGE IVAN RIVEROS,**
**LUIS FERNANDO VELASQUEZ-RAMIREZ,**
**NARCISO RONDON-MEJIA,**
**SEVERO CONFESSOR,**
**EARL DELVILLE HODGE**
**a/k/a, "Bob Hodge,"**
**JUAN FIGUEROA-VALDEZ,**
**CARLSTON BEAZER,**
**CHAD SKELTON,**
**and**
**HUMBERTO GALLEGO,**

did knowingly and intentionally combine, conspire, confederate and agree with each other and with

others unknown to the Grand Jury to:

      a.     distribute cocaine, a Schedule II controlled substance, intending that such

substance will be unlawfully imported into the United States or into waters within a distance of 12

miles of the coast of the United States in violation of Title 21, United States Code, Section 959

(a)(1); and

      b.     possess with intent to distribute cocaine, a Schedule II controlled substance,

while on board an aircraft registered in the United States and with a United States citizen on board

in violation of Title 21, United States Code, Section 959(b)(1).

2

## Ways and Means of the Conspiracy

1.     It was part of this conspiracy that the defendants, Roberto Mendez-Hurtado and Alvaro Ricardo Nino-Bonilla, a/k/a "Lucas," a/k/a "Mono," would solicit the services of a United States pilot from the Southern District of Florida to purchase airplanes, radio equipment and airplane equipment to fly to Apure, Venezuela, pick up loads of cocaine and distribute cocaine to waiting boats and off-load crews in waters near the British Virgin Islands and landing strips in Guatemala and Honduras.

2.     It was further part of this conspiracy that the defendants Roberto Mendez-Hurtado and Alvaro Ricardo Nino-Bonilla, a/k/a "Lucas," a/k/a "Mono," would cause money to be wired to bank accounts in the United States and would cause money to be hand-delivered to the pilot or his representatives in the United States to pay for airplanes, airplane equipment, radio equipment, and travel to be used to prepare for and fly cocaine from Apure, Venezuela to waters off the British Virgin Islands and landing strips in Guatemala and Honduras.

3.     It was further part of the conspiracy that Roberto Mendez-Hurtado would direct Samuel Javier to receive radio equipment to assist in the distribution of cocaine, in Saint Thomas, U.S. Virgin Islands.

4.     It was further part of this conspiracy that the defendants Severo Confessor, Narciso Rondon-Mejia, Luis Fernando Velasquez-Ramirez, Humberto Gallego and others unknown to the Grand Jury would distribute money to be used to promote, facilitate and carry on the distribution of cocaine by a United States pilot flying a United States registered aircraft from Apure, Venezuela to the British Virgin Islands, Guatemala and Honduras.

3

5.     It was further part of the conspiracy that the defendants Roberto Mendez-Hurtado, Alvaro Ricardo Nino Bonilla, a/k/a "Lucas," a/k/a "Mono" and Jorge Ivan Riveros would cause the delivery and would deliver a false Venezuelan passport and false Venezuelan identification documents for the United States pilot's use in flying to Venezuela to pick up cocaine for distribution.

6.     It was further part of the conspiracy that the defendant, Earl Delville Hodge, a/k/a "Bob Hodge," would direct the defendants, Juan Figueroa-Valdez, Chad Skelton, Carlston Beazer and others unknown to the Grand Jury, to operate on fast boat crews to pick up cocaine dropped from airplanes in the waters off the British Virgin Islands with the intent that the cocaine be distributed in the United States.

7.     It was further part of this conspiracy that Roberto Mendez-Hurtado paid Roberto Harrigan, a/k/a "Tico," a British Virgin Islands customs officer, to collect from Earl Delville Hodge, a/k/a "Bob Hodge" proceeds from cocaine sold in Puerto Rico and elsewhere, conceal those cocaine proceeds and deliver those proceeds for airplane transportation to Venezuela.

8.     It was further part of this conspiracy that Roberto Mendez-Hurtado paid Roberto Harrigan, a/k/a "Tico," a British Virgin Islands customs officer, to permit employees of Roberto Mendez-Hurtado's cocaine distribution organization to illegally enter and remain in the British Virgin Islands using false Venezuelan passports and to make, collect and record payments for cocaine distributions made by Roberto Mendez-Hurtado's cocaine distribution organization under the protection of a British Virgin Islands customs officer.

9.     It was further part of this conspiracy that Alvaro Ricardo Nino-Bonilla, a/k/a "Lucas," a/k/a "Mono," and individuals unknown to the Grand Jury, would meet Pilot A.A. and his United States registered aircraft in Apure, Venezuela; would house Pilot A.A. and his co-pilot; would refuel

4

the United States registered aircraft; would alter the markings on the aircraft to disguise the aircraft and would load the aircraft with cocaine.

10.    It was further part of the conspiracy that individuals unknown to the Grand Jury, would prepare, protect and maintain an airstrip in Apure, Venezuela for the landing, concealment, refueling, loading and take off of aircraft used to transport multi-hundred kilogram loads of cocaine.

11.    It was further part of the conspiracy that on or about September 28, 2010, Pilot A.A. would airdrop cocaine in waters off the British Virgin Islands.

12.    It was further part of the conspiracy that on or about September 29, 2010, Earl Delville Hodge, a/k/a "Bob Hodge," would pick up from the waters of the British Virgin Islands and would cause cocaine to be concealed on Norman Island, British Virgin Islands, within twelve (12) miles of the United States coastline.

All in violation of Title 21, United States Code, Section 963.

## COUNT 2

From in or around March 2009, through the date of the return of this indictment, the exact dates being unknown to the Grand Jury, in Miami-Dade County, in the Southern District of Florida and elsewhere, the defendants,

**ROBERTO MENDEZ-HURTADO,**
**ALVARO RICARDO NINO-BONILLA,**
**a/k/a "Lucas,"**
**a/k/a "Mono,"**
**LUIS FERNANDO VELASQUEZ-RAMIREZ,**
**NARCISO RONDON-MEJIA,**
**SEVERO CONFESSOR,**
**and**
**HUMBERTO GALLEGO,**

did knowingly and intentionally combine, conspire, confederate and agree with each other and with

5

others unknown to the Grand Jury to commit certain offenses against the United States, in violation of Title 18, United States Code, Section 1956, namely:

      a.    to conduct financial transactions in interstate and foreign commerce, with the intent to promote the carrying on of specified unlawful activity, involving property used to conduct and facilitate specified unlawful activity in violation of Title 18, United States Code, Section 1956(a)(3)(A); and

      b.    to transport, transmit, and transfer monetary instruments and funds to a place in the United States from or through a place outside the United States, with the intent to promote the carrying on of specified unlawful activity in violation of Title 18, United States Code, Section 1956(a)(2)(A).

It is further alleged that the specified unlawful activity is conspiracy to distribute cocaine, a Schedule II controlled substance, intending that such substance will be unlawfully imported into the United States or into waters within a distance of twelve (12) miles of the coast of the United States in violation of Title 21, United States Code, Section 959(a)(1) and 963 and conspiracy to possess with intent to distribute cocaine, a Schedule II controlled substance, on board an aircraft registered in the United States and with a United States citizen on board, in violation of Title 21, United States Code, Section 959(b)(2) and 963.

### Ways and Means of the Conspiracy

It was the part of this conspiracy that the defendants, Roberto Mendez-Hurtado and Alvaro Ricardo Nino-Bonilla, a/k/a "Lucas," a/k/a "Mono," would cause the defendants, Narciso Rondon-Mejia, Severo Confessor, Luis Fernando Velasquez-Ramirez, Humberto Gallego and others unknown to the Grand Jury, to conduct financial transactions in interstate and foreign commerce

6

which would provide funds to a United States pilot to be used to purchase airplanes, radio equipment, airplane equipment and travel in order to fly from the United States to Apure, Venezuela, pickup and transport cocaine and distribute the cocaine to offload crews located in the waters off the British Virgin Islands, in Guatemala and Honduras.

All in violation of Title 18, United States Code, Section 1956(h).

### COUNT 3

On or about September 28, 2010, in the country of Venezuela, and elsewhere, the defendants,

**ROBERTO MENDEZ-HURTADO**
**and**
**ALVARO RICARDO NINO-BONILLA,**
**a/k/a "Lucas,"**
**a/k/a "Mono,"**

did knowingly and intentionally cause to be possessed with intent to distribute cocaine, a Schedule II controlled substance, while on board an aircraft registered in the United States and with a United States citizen aboard said aircraft bearing U.S. aircraft registration number N155TT, in violation of Title 21, United States Code, Section 959(b)(2) and Title 18, United States Code, Section 2.

Pursuant to Title 21, United States Code, Section 960(b)(1)(B), it is further alleged that this violation involved five (5) kilograms or more of a mixture and substance containing a detectable amount of cocaine.

7

### COUNT 4

On or about September 28, 2010, in the country of Venezuela, and elsewhere, the defendants,

**ROBERTO MENDEZ-HURTADO**
**and**
**ALVARO RICARDO NINO-BONILLA,**
**a/k/a "Lucas,"**
**a/k/a "Mono,"**

did knowingly and intentionally cause to be distributed cocaine, a Schedule II controlled substance, intending that such substance would be unlawfully imported into the United States or into waters within a distance of 12 miles of the coast of the United States, in violation of Title 21, United States Code, Section 959(a)(1) and Title 18, United States Code, Section 2.

Pursuant to Title 21, United States Code, Section 960(b)(1)(B), it is further alleged that this violation involved five (5) kilograms or more of a mixture and substance containing a detectable amount of cocaine.

### COUNT 5

On or about April 12, 2010, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendant,

**ROBERTO MENDEZ-HURTADO,**

with intent to promote the carrying on of a specified unlawful activity, did conduct a financial transaction in interstate and foreign commerce, involving property used to conduct and facilitate specified unlawful activity, in violation of Title 18, United States Code, Sections 1956(a)(3)(A) and 2.

It is further alleged that the specified unlawful activity is the possession with intent to distribute a controlled substance, that is, cocaine, on board a United States registered aircraft and

8

with a United States citizen on board, in violation of Title 21, United States Code, Section 959(b)(2).

## COUNT 6

On or about May 28, 2010, in Miami-Dade County, in the Southern District of Florida and elsewhere, the defendant,

### ROBERTO MENDEZ-HURTADO,

with intent to promote the carrying on of a specified unlawful activity, did conduct and did cause a financial transaction in interstate and foreign commerce, involving property used to conduct and facilitate specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(3)(A) and 2.

It is further alleged that the specified unlawful activity is the possession with intent to distribute a controlled substance, that is, cocaine, on board a United States registered aircraft and with a United States citizen on board, in violation of Title 21, United States Code, Section 959(b)(2).

## COUNT 7

On or about May 24, 2010, in Miami-Dade County, in the Southern District of Florida and elsewhere, the defendants,

### ROBERTO MENDEZ-HURTADO
### and
### ALVARO RICARDO NINO-BONILLA,
### a/k/a "Lucas,"
### a/k/a "Mono,"

with intent to promote the carrying on of a specified unlawful activity, did conduct and did cause a financial transaction in interstate and foreign commerce, involving property used to conduct and facilitate specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(3)(A) and 2.

It is further alleged that the specified unlawful activity is the possession with intent to

distribute a controlled substance, that is, cocaine, on board a United States registered aircraft and with a United States citizen on board in violation of Title 21, United States Code, Section 959(b)(2).

### COUNT 8

On or about September 13, 2010, at Miami-Dade County, in the Southern District of Florida and elsewhere, the defendants,

**ROBERTO MENDEZ-HURTADO,**
**ALVARO RICARDO NINO-BONILLA,**
**a/k/a "Lucas,"**
**a/k/a "Mono,"**
**and**
**LUIS FERNANDO VELASQUEZ-RAMIREZ,**

with intent to promote the carrying on of a specified unlawful activity, did conduct and did cause a financial transaction in interstate and foreign commerce, involving property used to conduct and facilitate specified unlawful activity, in violation of Title 18, United States Code, Sections 1956(a)(3)(A) and 2.

It is further alleged that the specified unlawful activity is the possession with intent to distribute a controlled substance, that is, cocaine, on board a United States registered aircraft and with a United States citizen on board in violation of Title 21, United States Code, Section 959(b)(2).

### COUNTS 9-18

On or about the dates set forth below, according to Counts, in the Southern District of Florida and elsewhere, the defendants, as set forth below, and persons known and unknown to the Grand Jury, knowingly and intentionally did travel and cause travel, used and caused to be used facilities in interstate and foreign commerce with intent to promote, manage, establish and carry on, and facilitate the promotion, management, establishment and carrying on of an unlawful activity, that is,

10

a business enterprise involving possession with intent to distribute cocaine, a Schedule II narcotic

controlled substance, aboard a United States registered aircraft with a United States citizen aboard

and a conspiracy to possess with intent to distribute cocaine, a Schedule II narcotic controlled

substance aboard a United States registered aircraft with a United States citizen aboard, and

thereafter did perform, attempt to perform and cause to be performed acts to promote, manage,

establish and carry on, and facilitate the promotion, management, establishment, and carrying on of

said unlawful activity, in violation of Title 18, United States Code, Sections 1952(a)(3) and 2.

| COUNT | DATE (ON OR ABOUT) | DEFENDANT | TRAVEL OR USE OF FACILITY | THEREAFTER ACT |
|---|---|---|---|---|
| 9 | 4/12/10 | Roberto Mendez-Hurtado | Western Union Wire Transfer of $3,000 from Dominican Republic to Miami, Florida. | Meetings between the pilot and Roberto Mendez-Hurtado in Antigua. |
| 10 | 4/14/10 | Roberto Mendez-Hurtado | Travel by Pilot A.A. from Miami, Florida to Antigua. | Meeting between the pilot and Roberto Mendez-Hurtado in Antigua. |
| 11 | 4/23/10 | Roberto Mendez-Hurtado and Samuel Javier | Fed. Ex. Shipment of two meter radios from Pompano Beach, Florida to St. Thomas, V.I. | Radios received by Samuel Javier in V.I. for airplane narcotics drops. |
| 12 | 5/28/10 | Roberto Mendez-Hurtado | Wire transfer of funds to Citi Bank in Coconut Creek, Florida from Dominican Republic. | Purchase of aircraft, U.S. Registration #N155TT. |
| 13 | 6/16/10 | Roberto Mendez-Hurtado and Alvaro Ricardo Nino-Bonilla, "Lucas," a/k/a "Mono." | Travel by Pilot AA from Miami, Florida to Aberdeen, South Dakota. | Purchase of aircraft, U.S. registration #N155TT. |
| 14 | 8/12/10 | Roberto Mendez-Hurtado and Alvaro Ricardo Nino-Bonilla, "Lucas," a/k/a "Mono." | Travel by Pilot AA from Miami, Florida to Bogota, Colombia. | Meeting with Alvaro Ricardo Nino-Bonilla, a/k/a "Lucas," a/k/a "Mono." |

| COUNT | DATE (ON OR ABOUT) | DEFENDANT | TRAVEL OR USE OF FACILITY | THEREAFTER ACT |
|---|---|---|---|---|
| 15 | 9/28/10 | Roberto Mendez-Hurtado and Alvaro Ricardo Nino-Bonilla, "Lucas," a/k/a "Mono." | Travel by Pilot A.A. from Miami, Florida to Apure, Venezuela. | Receive cocaine in Apure, Venezuela. |
| 16 | 9/19/10 | Roberto Mendez-Hurtado, Alvaro Ricardo Nino-Bonilla, "Lucas," a/k/a "Mono" and Jorge Ivan Riveros. | Travel from Bogota, Colombia to Miami, Florida. | Delivery of false Venezuelan passport and identification papers to the pilot. |
| 17 | 1/20/11 | Roberto Mendez-Hurtado and Alvaro Ricardo Nino-Bonilla, "Lucas," a/k/a "Mono." | Travel by Pilot A.A. from Miami, Florida to Retalhuleu, Guatemala. | Examination of landing strips in Guatemala. |
| 18 | 3/29/11 | Alvaro Ricardo Nino-Bonilla, "Lucas," a/k/a "Mono." | Travel by Pilot A.A. from Miami, Florida to San Pedro Sula, Honduras. | Examination of landing strips in Honduras. |

## COUNT 19

On or about September 20, 2010, in Miami-Dade County, in the Southern District of Florida,

the defendants,

**ROBERTO MENDEZ-HURTADO,**
**ALVARO RICARDO NINO-BONILLA,**
**a/k/a "Lucas,"**
**a/k/a "Mono,"**
**and**
**JORGE IVAN RIVEROS,**

did willfully and knowingly furnish and deliver and did cause to be furnished and delivered a

Venezuelan passport in the name of V.A.F.B., bearing a date of birth of January 21, 1959, to Pilot

A.A., knowing that Pilot A.A. was not the person for whose use said passport was originally issued

and designed, in violation of Title 18, United States Code, Sections 1544 and 2.

It is further alleged that said passport was furnished and delivered to facilitate the drug trafficking crimes of conspiracy to possess with intent to distribute cocaine, a Schedule II narcotic controlled substance aboard a United States registered aircraft with a United States citizen aboard and possession with intent to distribute cocaine aboard a United States registered aircraft with a United States citizen on board in violation of Title 21, United States Code, Sections 959(b)(2) and 963.

### FORFEITURE ALLEGATIONS

1.      The allegations of this Indictment are re-alleged and by this reference fully incorporated herein for purposes of alleging forfeiture to the United States of America of certain property in which the defendants,

> **ROBERTO MENDEZ-HURTADO,**
> **ALVARO RICARDO NINO-BONILLA,**
>      **a/k/a "Lucas,"**
>      **a/k/a "Mono,"**
> **ROBERTO HARRIGAN,**
>      **a/k/a "Tico,"**
> **SAMUEL JAVIER,**
> **JORGE IVAN RIVEROS,**
> **LUIS FERNANDO VELASQUEZ-RAMIREZ,**
> **NARCISO RONDON-MEJIA,**
> **SEVERO CONFESSOR,**
> **EARL DELVILLE HODGE**
>      **a/k/a, "Bob Hodge,"**
> **JUAN FIGUEROA-VALDEZ,**
> **CARLSTON BEAZER,**
> **CHAD SKELTON,**
> **and**
> **HUMBERTO GALLEGO,**

have an interest.

13

2.     Upon conviction of a violation of Title 21, United States Code, Section 963 or 959, as alleged in this Indictment, the defendant so convicted shall forfeit all of their respective right, title and interest to the United States in any property constituting, or derived from, any proceeds obtained, directly or indirectly, as the result of such violation and in any property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such violation, pursuant to Title 21, United States, Section 853(a)(1)(2).

3.     Upon conviction of a violation, or a conspiracy to violate, Title 18, United States Code, Section 1956, as alleged in this Indictment, the defendant so convicted shall forfeit all of their respective right, title and interest to the United States in any property, real or personal, involved in such violation, and in any property traceable to such property, pursuant to Title 18, United States Code, 982(a)(1).

4.     Upon conviction of a violation of Title 18, United States Code, Section 1544, as alleged in this Indictment, the defendant so convicted shall forfeit all of their respective right, title and interest to the United States in the following property pursuant to Title 18, United States Code, Section 982(a)(6):

a..     any conveyance, including any vessel, vehicle, or aircraft used in the commission of such violation; and

b.     any property real or personal--

i.     that constitutes, or is derived from or is traceable to the proceeds obtained directly or indirectly from such violation; or

ii.     that is used to facilitate, or is intended to be used to facilitate, the commission of such violation.

14

5.     Upon conviction of a violation of Title 18, United States Code, Section 1952, as alleged in this Indictment, the defendant so convicted shall forfeit to the United States all of their respective right, title and interest in any property, real or personal, which constitutes or is derived from proceeds traceable to such violation pursuant to Title 18, United States Code, Section 981(a)(1)(C), as made applicable by Title 28, United States Code, Section 2461(c).

All pursuant to Title 18, United States Code, Sections 981 and 982 and and Title 21, United States Code, Section 853.

**A TRUE BILL**

**FOREPERSON**

WIFREDO A. FERRER
**UNITED STATES ATTORNEY**

RICHARD GREGORIE
**ASSISTANT UNITED STATES ATTORNEY**

15

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA

vs.

ROBERTO MENDEZ-HURTADO, et al.

               **Defendant.**

_____/

CASE NO. _____

**CERTIFICATE OF TRIAL ATTORNEY\***

**Superseding Case Information:**

**Court Division:** (Select One)

| | |
|---|---|
| _X_ Miami | ____ Key West |
| ____ FTL | ____ WPB   ____ FTP |

New Defendant(s)     Yes _____   No _____
Number of New Defendants
Total number of counts _____

I do hereby certify that:

1.   I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2.   I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3.   Interpreter:   (Yes or No)   __Yes__
    List language and/or dialect   ____Spanish____

4.   This case will take   __10__  days for the parties to try.

5.   Please check appropriate category and type of offense listed below:

   (Check only one)                   (Check only one)

| | | | | | |
|---|---|---|---|---|---|
| I | 0 to 5 days | _____ | Petty | _____ |
| II | 6 to 10 days | __X__ | Minor | _____ |
| III | 11 to 20 days | _____ | Misdem. | _____ |
| IV | 21 to 60 days | _____ | Felony | __X__ |
| V | 61 days and over | _____ | | |

6.   Has this case been previously filed in this District Court? (Yes or No)   __No__
If yes:
Judge: _____   Case No. _____
(Attach copy of dispositive order)
Has a complaint been filed in this matter?   (Yes or No)   __No__
If yes:
Magistrate Case No. _____
Related Miscellaneous numbers: _____
Defendant(s) in federal custody as of _____
Defendant(s) in state custody as of _____
Rule 20 from the _____   District of _____

Is this a potential death penalty case? (Yes or No)   __No__

7.   Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to October 14, 2003? _____ Yes  __X__ No

8.   Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to September 1, 2007? _____ Yes  __X__ No

_____
RICHARD D. GREGORIE
ASSISTANT UNITED STATES ATTORNEY
Florida Bar No./Court No. 549495

*Penalty Sheet(s) attached

REV 4/8/08

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name:  ROBERTO MENDEZ-HURTADO**

**Case No:** _____

**Count # 1**

Conspiracy to possess cocaine on board a U.S. aircraft with intent to import it into the U.S.

Title 21, United States Code, Section 963

**\* Max.Penalty:**     Life Imprisonment

**Counts # 2**

Conspiracy to commit money laundering.

Title 18, United States Code, Section 1956(h)

**\* Max.Penalty:**     Twenty Years' Imprisonment

**Count # 3**

Possession with intent to distribute cocaine on board an aircraft.

Title 21, United States Code, Section 959(b)(2)

**\* Max.Penalty:**     Life Imprisonment

**Count # 4**

Possession with intent to import cocaine into the U.S.

Title 21, United States Code, Section 959(a)(1)

**\* Max.Penalty:**     Life Imprisonment

**Defendant's Name:  ROBERTO MENDEZ-HURTADO**

Count # 5

  Money laundering.

  Title 18, United States Code, Section 1956(a)(3)(A)

**\* Max.Penalty**:     Twenty Years' Imprisonment

Count # 6

  Money laundering.

  Title 18, United States Code, Section 1956(a)(3)(A)

**\* Max.Penalty**:     Twenty Years' Imprisonment

Counts # 7

  Money laundering.

  Title 18, United States Code, Section 1956(a)(3)(A)

**\* Max.Penalty**:     Twenty Years' Imprisonment

Count # 8

  Money laundering.

  Title 18, United States Code, Section 1956(a)(3)(A)

**\* Max.Penalty**:     Twenty Years' Imprisonment

Count  # 9

  Travel act.

  Title 18, United States Code, Section 1952(a)(3)

**\* Max.Penalty**:     Five Years' Imprisonment

**Defendant's Name:  ROBERTO MENDEZ-HURTADO**

Count #10

  Travel act.

  Title 18, United States Code, Section 1952(a)(3)

**\* Max.Penalty**:     Five Years' Imprisonment

Count #11

  Travel act.

  Title 18, United States Code, Section 1952(a)(3)

**\* Max.Penalty**:     Five Years' Imprisonment

Count #12

  Travel act.

  Title 18, United States Code, Section 1952(a)(3)

**\* Max.Penalty**:     Five Years' Imprisonment

Count #13

  Travel act.

  Title 18, United States Code, Section 1952(a)(3)

**\* Max.Penalty**:     Five Years' Imprisonment

Count #14

  Travel act.

  Title 18, United States Code, Section 1952(a)(3)

**\* Max.Penalty**:     Five Years' Imprisonment

**Defendant's Name:  ROBERTO MENDEZ-HURTADO**

Count #15

  Travel act.

  Title 18, United States Code, Section 1952(a)(3)

**\* Max.Penalty**:     Five Years' Imprisonment

Count #16

  Travel act.

  Title 18, United States Code, Section 1952(a)(3)

**\* Max.Penalty**:     Five Years' Imprisonment

Count #17

  Travel act.

  Title 18, United States Code, Section 1952(a)(3)

**\* Max.Penalty**:     Five Years' Imprisonment

Count #19

  Passport misuse in furtherance of a narcotics offense.

  Title 18, United States Code, Section 1544

**\* Max.Penalty**:     Twenty Years' Imprisonment

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

<u>PENALTY SHEET</u>

**Defendant's Name:  ALVARO RICARDO NINO-BONILLA,**
                  **a/k/a "Lucas," a/k/a "Mono."**

**Case No**: _____

Count  # 1

  Conspiracy to possess cocaine on board a U.S. aircraft with intent to import it into the U.S.

   Title 21, United States Code, Section 963

**\* Max.Penalty**:     Life Imprisonment

Counts # 2

  Conspiracy to commit money laundering.

   Title 18, United States Code, Section 1956(h)

**\* Max.Penalty**:     Twenty Years' Imprisonment

Count # 3

  Possession with intent to distribute cocaine on board an aircraft.

   Title 21, United States Code, Section 959(b)(2)

**\* Max.Penalty**:     Life Imprisonment

Count # 4

  Possession with intent to import cocaine into the U.S.

   Title 21, United States Code, Section 959(a)(1)

**\* Max.Penalty**:     Life Imprisonment

**Defendant's Name:  ALVARO RICARDO NINO-BONILLA,**
**a/k/a "Lucas," a/k/a "Mono."**


Counts # 7

  Money laundering.

   Title 18, United States Code, Section 1956(a)(3)(A)

**\* Max.Penalty**:     Twenty Years' Imprisonment

Count # 8

  Money laundering.

   Title 18, United States Code, Section 1956(a)(3)(A)

**\* Max.Penalty**:     Twenty Years' Imprisonment

Count #13

  Travel act.

   Title 18, United States Code, Section 1952(a)(3)

**\* Max.Penalty**:     Five Years' Imprisonment

Count #14

  Travel act.

   Title 18, United States Code, Section 1952(a)(3)

**\* Max.Penalty**:     Five Years' Imprisonment

Count #15

  Travel act.

   Title 18, United States Code, Section 1952(a)(3)

**\* Max.Penalty**:     Five Years' Imprisonment

Defendant's Name:   **ALVARO RICARDO NINO-BONILLA,**
                    **a/k/a "Lucas," a/k/a "Mono."**

Count #16

  Travel act.

  Title 18, United States Code, Section 1952(a)(3)

**\* Max.Penalty**:    Five Years' Imprisonment

Count #17

  Travel act.

  Title 18, United States Code, Section 1952(a)(3)

**\* Max.Penalty**:    Five Years' Imprisonment

Count #18

  Passport misuse in furtherance of a narcotics offense.

  Title 18, United States Code, Section 1544

**\* Max.Penalty**:    Twenty Years' Imprisonment

**\*Refers only to possible term of incarceration, does not include possible fines, restitution,
special assessments, parole terms, or forfeitures that may be applicable.**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

PENALTY SHEET

**Defendant's Name:** **ROBERTO HARRIGAN**

**Case No:** _____

Count # 1

  Conspiracy to possess cocaine on board a U.S. aircraft with intent to import it into the U.S.

  Title 21, United States Code, Section 963

**\* Max.Penalty**:     Life Imprisonment

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

<u>PENALTY SHEET</u>

**Defendant's Name:  SAMUEL JAVIER**

**Case No**: _____

Count # 1

  Conspiracy to possess cocaine on board a U.S. aircraft with intent to import it into the U.S.

   Title 21, United States Code, Section 963

**\* Max.Penalty**:     Life Imprisonment

Count #11

  Travel act.

  Title 18, United States Code, Section 1952(a)(3)

**\* Max.Penalty**:     Five Years' Imprisonment

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name:  JORGE IVAN RIVEROS**

**Case No**: _____

Count # 1

   Conspiracy to possess cocaine on board a U.S. aircraft with intent to import it into the U.S.

   Title 21, United States Code, Section 963

**\* Max.Penalty**:     Life Imprisonment

Count #16

   Travel act.

   Title 18, United States Code, Section 1952(a)(3)

**\* Max.Penalty**:     Five Years' Imprisonment

Count #19

   Passport misuse in furtherance of a narcotics offense.

   Title 18, United States Code, Section 1544

**\* Max.Penalty**:     Twenty Years' Imprisonment

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name:  LUIS FERNANDO VELASQUEZ-RAMIREZ**

**Case No:** _____

Count # 1

  Conspiracy to possess cocaine on board a U.S. aircraft with intent to import it into the U.S.

   Title 21, United States Code, Section 963

**\* Max.Penalty**:     Life Imprisonment

Counts # 2

  Conspiracy to commit money laundering.

  Title 18, United States Code, Section 1956(h)

**\* Max.Penalty**:     Life Imprisonment

Count # 8

  Money laundering.

  Title 18, United States Code, Section 1956(a)(3)(A)

**\* Max.Penalty**:     Twenty Years' Imprisonment

**\*Refers only to possible term of incarceration, does not include possible fines, restitution,
special assessments, parole terms, or forfeitures that may be applicable.**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

<u>PENALTY SHEET</u>

**Defendant's Name:  NARCISO RONDON-MEJIA**

**Case No:** _____

Count # 1

  Conspiracy to possess cocaine on board a U.S. aircraft with intent to import it into the U.S.

   Title 21, United States Code, Section 963

**\* Max.Penalty:**    Life Imprisonment

Counts # 2

  Conspiracy to commit money laundering.

  Title 18, United States Code, Section 1956(h)

**\* Max.Penalty:**    Twenty Years' Imprisonment

 **\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name:  SEVERO CONFESSOR**

**Case No**: _____

Count # 1

  Conspiracy to possess cocaine on board a U.S. aircraft with intent to import it into the U.S.

   Title 21, United States Code, Section 963

**\* Max.Penalty**:    Life Imprisonment

Counts # 2

  Conspiracy to commit money laundering.

   Title 18, United States Code, Section 1956(h)

**\* Max.Penalty**:    Twenty Years' Imprisonment

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name:  EARL DELVILLE HODGE, a/k/a "Bob Hodge"**

**Case No:** _____

Count # 1

 Conspiracy to possess cocaine on board a U.S. aircraft with intent to import it into the U.S.

 Title 21, United States Code, Section 963

**\* Max.Penalty:**     Life Imprisonment

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name:** __JUAN FIGUEROA-VALDEZ__

**Case No:** _____

Count # 1

___Conspiracy to possess cocaine on board a U.S. aircraft with intent to import it into the U.S.___

___Title 21, United States Code, Section 963___

**\* Max.Penalty:**    Life Imprisonment

**Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name:** __CARLSTON BEAZER__

**Case No**: _____

Count # 1

__Conspiracy to possess cocaine on board a U.S. aircraft with intent to import it into the U.S.__

__Title 21, United States Code, Section 963__

**\* Max.Penalty**: Life Imprisonment

**Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name:** CHAD SKELTON

**Case No:** _____

Count # 1

  Conspiracy to possess cocaine on board a U.S. aircraft with intent to import it into the U.S.

  Title 21, United States Code, Section 963

**\* Max.Penalty:**     Life Imprisonment

**Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name:  HUMBERTO GALLEGO**

**Case No**: _____

Count  # 1

  Conspiracy to possess cocaine on board a U.S. aircraft with intent to import it into the U.S.

   Title 21, United States Code, Section 963

**\* Max.Penalty**:    Life Imprisonment

Counts # 2

  Conspiracy to commit money laundering.

  Title 18, United States Code, Section 1956(h)

**\* Max.Penalty**:    Twenty Years' Imprisonment

**Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

# EXHIBIT B

REPÚBLICA BOLIVARIANA DE VENEZUELA

PASAPORTE / PASSPORT

Tipo / Type
P

VEN

Apellidos / Surnames
MARTIN OLIVARES

Nombres / Given names
PEDRO LUIS

Nacionalidad / Nationality
VENEZOLANA

Pasaporte Nº / Passport Nº
057530116

Fecha de Nacimiento / Date of birth
18 / Abr / Apr / 1967

Fecha de Emisión / Date of issue
23 / Abr / Apr / 2012

Fecha de Vencimiento / Date of expiry
22 / Abr / Apr / 2017

Cédula de identidad Nº / Personal Nº
6232562

Sexo / Sex
M

Lugar de Nacimiento / Place of birth
CARACAS VEN

19-04-17

P<VENMARTIN<OLIVARES<<PEDRO<LUIS<<<<<<<<<<<<
0575301162VEN6704182M17042246252562<<<<<<<28















# EXHIBIT C

**MARTIN OLIVARES Pedro Luis**                    Control No.: A-5814/7-2015

Requesting Country: UNITED STATES
File No.: 2015/49069
Date of Publication: 18 July 2015

CIRCULATION TO THE MEDIA (INCLUDING INTERNET) OF THE EXTRACTED
VERSION OF THE RED NOTICE AS PUBLISHED ON INTERPOL'S PUBLIC WEB
SITE: NO



RED

## FUGITIVE WANTED FOR PROSECUTION

1. ## IDENTITY PARTICULARS

 



WARNING: THIS PERSON MAY BE DANGEROUS

Family Name: MARTIN OLIVARES
Family Name in the Original Script or Chinese Telegraphic Code: N/A
Family Name at Birth: MARTIN OLIVARES
Forenames: Pedro Luis
Forenames in the Original Script or Chinese Telegraphic Code: N/A
Date and Place of Birth: 18 April 1967 - Federal District, Venezuela
Sex: Male

Nationality: VENEZUELAN (CONFIRMED)

**Also Known As / Other Dates of Birth Used:**

| *Family name* | *Forenames* | *Date of birth* |
|---|---|---|
| LOUIS | Pedro Martin | |
| LOUIS | Pedro Martin | |
| LUIS | Pedro Martin | |
| MARTIN | Pedro L. | |
| MARTIN | Pedro Louis | |
| MARTIN | Pedro Louis Olivares | |
| MARTIN | Pedro Luis | |
| MARTIN | Pedro Luis Olivares | |
| MARTIN | Peoro | |
| MARTIN OLIVARES | Pedro Louis | |
| MARTIN OLIVARES | Pedro Luis | 06 December 1972 |
| MARTIN OLIVARES | Pedro Luis | 18 February 1967 |
| MARTIN-OLIVARES | Pedro Louis | |
| MARTIN-OLIVARES | Pedro Luis | |
| OLIVARES | Martin | |
| OLIVARES | Pedro Louis | |
| OLIVARES | Pedro Louis Martin | |
| OLIVARES | Pedro Luis | |
| OLIVARES | Pedro Luis Martin | |
| PEDRO | Luis | |
| PEDRO | Martin | |

**Marital Status:** N/A
**Father's Family Name and Forenames:** MARTIN
**Mother's Maiden Name and Forenames:** OLIVARES
**Occupation:** Businessman
**Languages Spoken:** Spanish
**Regions/Countries Likely to Be Visited:** Spain
**Additional Information:** N/A

**Identity Documents:**
Venezuelan passport No. 110284837
Venezuelan passport No. 6252562
Venezuelan national identification nr No. 6252562, issued on 18 April 1967

| **Description:** | **Height:** 170 cm | **Weight:** 113 kg |
|---|---|---|
| | **Hair:** Brown | **Eyes:** Hazel |
| | **Build:** Stocky | |

**Distinguishing Marks and Characteristics:** MARTIN OLIVARES' brown hair is greying, he may be 170-173 centimeters tall, and he may weigh 100-113 kilograms.

2.   **JUDICIAL INFORMATION**

*The summary of facts and judicial information reflect the original request from the NCB and are not modified by the General Secretariat.*

**Summary of Facts of the Case:** UNITED STATES, Southern district of Florida: From 01 January 2000 to September 2010

From at least approximately 2000 to September 2010, in Colombia, Venezuela, Mexico and elsewhere, Pedro Luis MARTIN OLIVARES, while in an official government capacity and Chief of Financial Intelligence in

Venezuela, conspired with others to distribute and import cocaine into the United States. MARTIN OLIVARES conspired with individuals who possessed with intent to distribute large quantities of cocaine on board a U.S. registered plane. MARTIN OLIVARES utilized his associations with high level government officials in Venezuela to accept bribes from high level narcotics traffickers in Venezuela and Colombia to facilitate the export of large loads of drugs from airports, airstrips and other means by shutting down military radars and bribing other government officials in an official capacity. After the drugs were sold in the United States, MARTIN OLIVARES was also responsible for receiving large sums of money from the profits, amassing a large fortune.

**Additional Facts of the Case:**  The U.S. Drug Enforcement Administration in cooperation with the Royal Virgin Islands Police Force, the U.S. Virgin Islands Police Force and several other law enforcement agencies joined forces to combat a sophisticated international drug trafficking organization based in Venezuela. This drug trafficking organization utilized the Caribbean islands to transport large loads of cocaine from Venezuela to the British and U.S. Virgin Islands for later transport to Puerto Rico, and the continental United States. This organization was identified as the Hurtado drug trafficking organization, which has been responsible for conducting air drops of an estimated 2,500 kilograms of cocaine into the Caribbean Sea between he U.S. Virgin Islands and the British Virgin Islands in 2010 and 2011.

On 28 and 29 September 2010, a joint U.S. Virgin Islands and British Virgin Islands maritime operation was held in an area off the northern coast of Tortola, British Virgin Islands, where information had indicated that air to sea drops of large shipments of cocaine were being made. During the operation and following a successful airdrop of a plane that flew from Venezuela, three individuals were arrested with eight bales containing 261 kilograms of cocaine. Following this seizure, several additional arrests and seizures were made that were attributed to the Hurtado drug trafficking organization. During the course of the investigation, it was determined that several drug laden planes departed Venezuela for several Caribbean islands where bales of cocaine were dropped to awaiting boats. Evidence also shows that the Hurtado organization regularly paid MARTIN OLIVARES to allow the drug planes to depart Venezuela safely, and without military or law enforcement interference.
**Accomplices:** N/A

## FUGITIVE WANTED FOR PROSECUTION

**ARREST WARRANT OR JUDICIAL DECISION 1**
**Charge:**  Conspiracy to distribute five kilograms or more of cocaine with the knowledge that it will be unlawfully imported into the U.S., and to distribute five kilograms or more cocaine on board an aircraft registered in the U.S.
**Law Covering the Offence:** Title 21, U.S. Code, Section 963
**Maximum Penalty Possible:** Life imprisonment
**Time Limit for Prosecution or Expiry Date of Arrest Warrant:** None

**Arrest Warrant or Judicial Decision Having the Same Effect:** No. 15-20299 CR-COOKE/TORRES, issued on 24 April 2015 by U.S. District Court, Southern District of New York in United States
**Name of signatory:**  Tammy Blakely, Deputy Clerk
**Copy of Arrest Warrant Available at the General Secretariat in the Language Used by the Requesting Country:** No

3.    <u>**ACTION TO BE TAKEN IF TRACED**</u>

**LOCATE AND ARREST WITH A VIEW TO EXTRADITION**
The country at the request of which the present notice has been published has given assurances that extradition will be sought upon arrest of the person, in conformity with its national laws and/or the applicable bilateral and multilateral treaties.

**PROVISIONAL ARREST**
For the country at the request of which the present notice has been published, this red notice is to be treated as a formal request for provisional arrest. Please apply provisional arrest, in conformity with national laws and/or the applicable bilateral and multilateral treaties.

Immediately inform NCB WASHINGTON United States of America (NCB reference:  20150721138 of 17 July 2015) and the ICPO-INTERPOL General Secretariat that the fugitive has been found.

# EXHIBIT D



LA REPUBLICA BOLIVARIANA DE VENEZUELA
EN SU NOMBRE
EL TRIBUNAL SUPREMO DE JUSTICIA

Judge Speaker Dr. **MAIKEL JOSÉ PÉREZ MORENO**

On the thirty-first (31st) day of August, 2015, is received at the Registry of this Court of Criminal Appeal record from the Tenth Court Ninth of First Instance in Control Functions of the Criminal Judicial Circuit of the Metropolitan Area of Caracas, related to the procedure of **passive extradition** of citizen, **PEDRO LUIS MARTIN OLIVARES**, a Venezuelan national, holder of the identity card number 6252562, who is required by the judicial authorities of the Government of the United States of America, by the International Red Notice A-5814 / 7-2015, dated eighthteenth (18) day of July 2015, for the alleged crime of association with the unlawful distribution of, at least five (5) kilograms of cocaine,  with  a view to sale.

Performance was given input, assigning the alphanumeric AA30-P-2015-000353 and, as of first (1st) of September of the same year , realized in Criminal Cassation Chamber of receipt of the file, appointing rapporteur Judge Dr . **MAIKEL JOSÉ PÉREZ MORENO** who provided character signs this failure.

Twenty - third (23nd) day of December 2015, under the designation of Judges and Magistrates (main and alternate) of the Supreme Court by the National Assembly of the Bolivarian Republic of Venezuela in extraordinary session, published in the Gazette officer no. 40816, corrected (due to an error) by Official Gazette no. 40818, published on December 29, 2015, was reconstituted this Court of Criminal Appeal as follows: Judge, Doctor **MAIKEL JOSÉ MORENO PÉREZ** , President; Judge, Doctor **FRANCE COELLO GONZÁLEZ** , Vice President; Judges and Doctors **ELSA GOMEZ JANETH MORENO** , **JUAN LUIS IBARRA Verenzuela** and **YANINA BEATRIZ DIAZ KARABIN** .

Contentivas performances of the extradition procedure, it is seen that the citizen **PEDRO LUIS MARTIN OLIVARES**, a Venezuelan national, holder of the identity card no. 6252562, was apprehended on the twenty - sixth (26th) August 2015, for officials assigned to the Investigation Division of Interpol, who left the following evidence:

"... Being eight and fifteen (8:15) in the morning appeared a citizen spontaneously a citizen in order to verify their legal status in this country and outside our borders, the person being identified as follows: <u>PEDRO LUIS MARTIN OLIVARES</u> (...) so it proceeded to check out before the research system and police information possible criminal records or requests that could present the citizen in question, (...) after entering the system and introduce the previously provided data was found that this citizen has no

Page **1** of **4**

requirement or any request in this country; thereupon  entered the international system of support for INTERPOL (...) in order to check on that computer system if it has any requirement, resulting after a brief wait that the aforementioned citizen presents Red Notice number **A-5814 / 7- 2015,** dated 18 July 2015 issued by the National Central Bureau in **Washington, United States** , for the alleged commission of an offense of Transport and Drug Trafficking (...) was informed the head of this office ( ...) who immediately he ordered that the citizen be given entry as a detainee to be brought to the court order of flagrancy .... "

This apprehension occurred following the International Red Alert, A-5814 / 7-2015, dated the eighteenth (18th) July 2015, for the alleged crime of conspiracy to distribute with a view to sale, at least five (5) kg of cocaine, which indicates:

"... **The facts:** South Florida (USA), between January 1, 2000 and September 30, 2010 District: Since at least 2000, approximately, and September 2010, Pedro Luis MARTÍN OLIVARES in the exercise of official functions and as director of Financial Intelligence of Venezuela, teamed up with others to illegally distributing cocaine and its introduction in the United States. He associated with people who had illegally on a plane enrollment American large amounts of cocaine with a view to sale. MARTIN OLIVARES used his contacts with senior officials of the State of Venezuela to accept bribes from great leaders of drug trafficking from Venezuela and Colombia in exchange for facilitating the export of large drug shipments from airports, airfields and other places closing military radars and bribing other officials official capacity. After the sale of the drug in the United States, MARTIN OLIVARES also received large sums of money from the profits generated by the operation, which he amassed a fortune (...) <u>**FUGITIVE WANTED FOR CRIMINAL PROSECUTION**</u> . **ARREST WARRANT OR JUDICIAL RESOLUTION 1. Qualification of crime:** Conspiracy to distribute at least 5 kg of cocaine knowing that it will be smuggled into the United States, and for conspiracy to distribute, with a view to selling at least 5kg of cocaine on a US – registered plane. **References to the provisions of criminal law repressing crime: Title 21, Article 963 of the United States Code.**
**Maximum Penalty:** life imprisonment.
**Prescription or expiration date of the warrant:** None
**Detention Order, or equivalent judicial resolution:** Case Number 15-20299 CR-COOKE / TORRES, issued on the twenty-fourth (24th) day of April 2015 by the judicial authorities SOUTHERN DISTRICT OF NEW YORK (US)  **3. <u>ACTION TO BE TAKEN IN CASE THIS PERSON IS  LOCATED HOLD FOR EXTRADITION.</u>** The country has requested the publication of this International Red Notice gives assurances that the locating and holding of a person for extradition shall be conducted in accordance with applicable national legislation and bilateral treaties and multilateral relevant be asked. **STOPPING PREVENTIVE** . For the country that requested the publication of this red notice, this should be considered as an official request for provisional arrest. Please proceed to preventive detention in accordance with applicable national law and relevant bilateral and multilateral treaties ... ".

Pedro Luis Martin Olivares was then made available to the Court Nineteen of First Instance in Control Functions of the Criminal Judicial Circuit of the Metropolitan Area of Caracas, who agreed to take precautionary measures to prevent deprivation of justice and liberty, and referred the case to this Court for appropriate measures.

On the second (2nd) day of October 2015, by decision number 611, the Criminal Cassation Chamber of the Supreme Court agreed to notify the Government of the United States of America, through the Ministry of Popular

Power for Foreign Affairs, the peremptory term of sixty (60) calendar days after its notification to submit the formal request for extradition and judicial documentation required in the procedure for extradition of the citizen **PEDRO LUIS MARTIN OLIVARES**, as provided in Article 388 of the Code of Criminal Procedure.

The ninth (9th) day of December 2015, trade 17332 was received, dated the third (3rd) of December 2015, signed by **HAROLD avilio MONTAÑO Briceno** , Director of the Bureau of Consular Affairs of the Ministry of Popular Power for Foreign Outside, through which he sent Note Verbale number 952, dated the sixth (6th) November 2015, from the Embassy of the United States of America, which stated:

"... The Embassy of the United States of America presents its compliments to the Ministry of Popular Power for Foreign Affairs of the Bolivarian Republic of Venezuela, and has the honor to refer to the diplomatic note of the Ministry Number 11385 of October 7th, 2015, which informed the embassy about the arrest in Venezuela of Pedro Luis Martin Olivares with a view to extradition in accordance with the Treaty and the Additional Article signed between the United States of America and the United States of Venezuela, signed on the 19th and 21st of January 1922. The Embassy wishes to inform the Ministry that the United States has not presented a formal extradition request for Pedro Luis Martin Olivares ... ".

Subsequently, on the fifteenth (15th) day of December 2015, another message was received. DGJIRC-2875, dated the tenth (10th) December 2015, signed by **JOSÉ ALBERTO CASTILLO CABRERA** , Director General (E) of Justice, Religious Institutions and Religious Affairs of the Ministry of Popular Power for the Interior, Justice and Peace , by which Note Verbale forwarded no. 952, dated the sixth day (6th) of November 2015, from the Embassy of the United States of America, by which stated:

"... The Embassy of the United States of America presents its compliments to the Ministry of Popular Power for Foreign Affairs of the Bolivarian Republic of Venezuela, and has the honor to refer to the diplomatic note of the Ministry No. 11385 of October 7th, 2015, which informed the embassy about the arrest, in Venezuela, of Pedro Luis Martin Olivares with a view to extradition, in accordance with the Treaty and the Additional Article signed between the United States of America and the United States of Venezuela, signed on the19th and 21st of January 1922 (...) the Embassy wishes to inform the Ministry that the United States did not present a formal extradition request for Pedro Luis Martin Olivares ... ".

In this order and according to the transcript of that note verbale, it is evident that the Government of the United States of America will not submit formal extradition request for the citizen **PEDRO LUIS MARTIN OLIVARES**, a Venezuelan national, holder of the certificate identity no. 6252562, who was being sought by the judicial authorities of that country, according to International Red Notice a-5814/7-2015, dated the eighteenth (18th) of July 2015. In this regard, it is clear that the United States of America's Government's judiciay expresses a formal and manifest disinterest in the extradition request.

Consequently, the appropriate and right step is to declare the withdrawing the application of passive extradition initiated in connection with the request made by the Public Prosecutor's Office for Flagrancy Room Metropolitan Area of Caracas. Also, since the Court Nineteen of First Instance in Control Functions of the Criminal Judicial Circuit of the Metropolitan Area of Caracas, imposed on the citizen **PEDRO LUIS MARTIN OLIVARES**, a Venezuelan national, holder of the identity card no. 6252562 , a injunction preventive judicial deprivation of liberty for extradition

**so you decide.**

**DECISION**

    For the above referred to the Supreme Court of Justice, Criminal Cassation Chamber, administering justice on behalf of the Republic, by authority of law, gives the following statements:

    **FIRST:** It **DECLARES** that the extradition procedure  of citizen **PEDRO LUIS MARTIN OLIVARES,** holder of the identity card no. 6252562, is abandoned

    **SECOND: ORDERED** the cessation of the detention order, imposed by Court Nineteen of First Instance in Control Functions of the Criminal Judicial Circuit of the Metropolitan Area of Caracas, on the twenty-sixth (26th) day of August, 2015, citizen **PEDRO LUIS MARTIN OLIVARES** , a Venezuelan national, holder of the identity card no. 6252562 and consequently **DECREES** his freedom without restrictions.

    **THIRD:** It is **ORDERED** that the Tenth Court Ninth of First Instance in Control Functions of the Criminal Judicial Circuit of the Metropolitan Area of Caracas: proceed with the lifting of the detention order imposed on the citizen **PEDRO LUIS MARTIN OLIVARES** , a Venezuelan national, holder of the certificate ID no. 6252562;  order his exclusion of people requested records (SIIPOL) and any other records related to the investigation that led to the present extradition proceedings initiated on the basis of the International Red Notice  A-5814/7-2015, dated the eighteenth (18th) day of July 2015 .

    **FOURTH** : Order the **Archive** of the documents contained in the application file for extradition of citizen **PEDRO LUIS MARTIN OLIVARES** , a Venezuelan national, holder with the identity card no. 6252562.

    Publish, register, offíciate the leading and filed the record.

    Given, signed and sealed in the Audience Hall of the Supreme Court of Justice, Criminal Cassation Chamber, at twenty-first (21st) days of January 2016. Years: 205th of Independence and 156th  of the Federation.

 Judge President,

 **MAIKEL JOSÉ PÉREZ MORENO**          Judge,
(Speaker)
Vice Judge,                              **JUAN LUIS IBARRA**
 **FRANCE COELLO GONZÁLEZ**        **Verenzuela**
Judge,                                 Judge,

**JANETH ELSA GOMEZ MORENO**      **YANINA BEATRIZ DIAZ KARABIN**

                                         The Secretary,

                                        **ANA GARCIA CONCEPCION yakeline**

# EXHIBIT E



**Dr. Horacio Bargiela A.**
*Medicina Interna*

Caracas. March 23th. 2017.

### MEDICAL RESUME

Patient: **MR. PEDRO LUIS MARTIN OLIVARES. 49 years old.**

I have had the pleasure of taking care of this patient since 2008. Mr. Pedro Luis is a 49 years old business man, born and rose in Venezuela. His medical history is relevant with the following medical conditions:

1.- Type 2 Diabetes mellitus; 2.- High blood pressure; 3.- Dyslipidemia (high triglycerides with low HDL cholesterol); 4.- Obesity with metabolic syndrome; 5.- NASH (non alcoholic stheato hepatitits).

His current medical treatment is: Nutritional considerations related most of all to the diabetes mellitus. Regular physical activity (at least 45 minutes' walk daily).

His current medication is: LOSRATAN 100 mg daily; JANUMET (50/850 MG) twice daily; GLIBENCLAMIDE 5 mg daily; METFORMIN XR: (500 mg) DAILY, ATORVASTATIN (40 mg) daily and CIPOFIBRATE 100 mg every other day; ; and PANTOPRAZOL 40 mg daily.

I use to evaluate Mr. Pedro Luis every six months, with history taking, complete physical exam; EKG, end lab exams, and every year he is asked to preform stress test echocardiogram. During this time everything was stable with his cardio-metabolic condition; whit optimal blood pressure, stable lipid profile, and optimal A1C Glycosylated hemoglobin. He kept this stable pace until August 2015 when cardio metabolic decompensation was first noticed.

On August 8th, 2015 I received an emergency call from Mr. Martín wife, notifying he was feeling not fine. My evaluation found high blood pressure (165/100 mm Hg), and high blood glucose levels (298 mg/dl). He had never had in the past such decompensations. He received urgent treatment modifications until resolve the crisis. Later on that very same month, ( August 26th) I receive a second emergency call. this time from Mr. Martin son, informing that his father was feeling sick. Again that time he was found to have hyperglycemia and elevated blood pressure. Since that time his current control has been more difficult to achieve. having frequent hypertensive crisis and glucose decompensations, and multiple treatment

**Dr. Horacio Bargiela A.**
Medicina Interna

modifications have been made in order to compensate him, even the use of injected insulin has been necessary in order to compensate the blood sugar. Additionally since that period of time, Mr. Pedro Luis has presented with anxiety/depression criteria, and medication with Sertraline 50 mg daily has been included.

His follow up visits have been characterized for intermittent glucose elevations and rise in blood pressure ridings in his chart.

I recommended him to intensify diet restrictions and exercise daily to achieve a better cardio metabolic control and to continuo with his medication, but he had never been optimal since august 2015.

If any other information is required please don't hesitate to call.

**Horacio Bargiela MD**

**INTERNAL MEDICINE.** Horacio Bargiela A.
Medicina Interna
**MPPS 40474** M.S.A.S.:40474 C.I. 6021218

**C.I. V-6821218**

# EXHIBIT F

940.1

# VENEZUELA

Treaty of extradition, and additional ar-
ticle.  Signed at Caracas January 19
and 21, 1922; entered into force
April 14, 1923.

43 Stat. 1698; TS 675; 12 Bevans 1128;
49 LNTS 435.                              940.3

VENEZUELA                    940.3

# EXTRADITION

*Treaty signed at Caracas January 19, 1922; additional article signed at
    Caracas January 21, 1922*
*Senate advice and consent to ratification January 5, 1923*
*Ratified by Venezuela February 15, 1923*
*Ratified by the President of the United States February 21, 1923*
*Ratifications exchanged at Caracas April 14, 1923*
*Entered into force April 14, 1923*
*Proclaimed by the President of the United States January 2, 1924*

43 Stat. 1698; Treaty Series 675

### TREATY

The United States of America and the United States of Venezuela, desir-
ing to strengthen their reciprocal relations, to facilitate the course of puni-
tive justice and to limit the crimes which may be committed in their respective
territories; to prevent the impunity which would result from the escape of
guilty persons and of their asylum in the territory of one or the other nation,
have resolved to conclude a Treaty for the extradition of the accused as well
as of those who have been sentenced, and have appointed for that purpose
the following Plenipotentiaries:

The President of the United States of America, John Campbell White,
Chargé d'Affaires ad interim of the United States of America to Venezuela,
and

The Provisional President of the United States of Venezuela, Doctor Pedro
Itriago Chacín, Minister of Foreign Affairs of the United States of Venezuela;

Who, after having exchanged their full powers, found in good and due
form, have agreed upon the following Articles;

### ARTICLE I

The Government of the United States of America and the Government of
the United States of Venezuela agree to deliver up to justice, by means of
requisition duly made as herein provided, any person who may be charged
with or may have been convicted of any of the crimes committed within the
jurisdiction of one of the Contracting Parties and specified in Article II of

this Convention, while said person was actually within such jurisdiction when the crime was committed, and who shall seek an asylum or who shall be found within the territories of the other. Such surrender shall take place only upon such evidence of guilt as, according to the laws of the country in which the fugitive or accused shall be found, would justify his detention and commitment for trial if the crime or offense had been committed there.

### ARTICLE II

In accordance with the provisions of this Convention, the persons shall be delivered who shall have been charged with or convicted of any of the following crimes:

1. Murder, comprehending the crimes designated by the terms of parricide, assassination, manslaughter, when voluntary; poisoning or infanticide.
2. The attempt to commit murder.
3. Rape, abortion, carnal knowledge of children under the age of twelve years.
4. Bigamy.
5. Arson.
6. Willful and unlawful destruction or obstruction of railroads, which endangers human life.
7. Crimes committed at sea:

(a). Piracy, as commonly known and defined by the law of nations or by statute;
(b). Wrongfully sinking or destroying a vessel at sea or attempting to do so;
(c). Mutiny or conspiracy by two or more members of the crew or other persons on board of a vessel on the high seas, for the purpose of rebelling against the authority of the captain or commander of such vessel or by fraud or violence taking possession of such vessel;
(d). Assault on board ships upon the high seas with intent to do bodily harm.

8. Burglary, defined to be the act of breaking into and entering the house of another in the night time with intent to commit a felony therein.
9. The act of breaking into and entering into the offices of the Government and public authorities, or the offices of banks, banking houses, saving banks, trust companies, insurance companies, or other buildings not dwellings with intent to commit a felony therein.
10. Robbery, defined to be the act of feloniously and forcibly taking from the person of another, goods or money by violence or by putting him in fear.
11. Forgery or the utterance of forged papers, or illegal sale of documents belonging to the national archives.

VENEZUELA                940.5

# EXTRADITION

*Treaty signed at Caracas January 19, 1922; additional article signed at Caracas January 21, 1922*
*Senate advice and consent to ratification January 5, 1923*
*Ratified by Venezuela February 15, 1923*
*Ratified by the President of the United States February 21, 1923*
*Ratifications exchanged at Caracas April 14, 1923*
*Entered into force April 14, 1923*
*Proclaimed by the President of the United States January 2, 1924*

43 Stat. 1698; Treaty Series 675

### TREATY

The United States of America and the United States of Venezuela, desiring to strengthen their reciprocal relations, to facilitate the course of punitive justice and to limit the crimes which may be committed in their respective territories; to prevent the impunity which would result from the escape of guilty persons and of their asylum in the territory of one or the other nation, have resolved to conclude a Treaty for the extradition of the accused as well as of those who have been sentenced, and have appointed for that purpose the following Plenipotentiaries:

The President of the United States of America, John Campbell White, Chargé d'Affaires ad interim of the United States of America to Venezuela, and

The Provisional President of the United States of Venezuela, Doctor Pedro Itriago Chacín, Minister of Foreign Affairs of the United States of Venezuela;

Who, after having exchanged their full powers, found in good and due form, have agreed upon the following Articles;

### ARTICLE I

The Government of the United States of America and the Government of the United States of Venezuela agree to deliver up to justice, by means of requisition duly made as herein provided, any person who may be charged with or may have been convicted of any of the crimes committed within the jurisdiction of one of the Contracting Parties and specified in Article II of

940.6           U.S. EXTRADITION TREATIES

12. The forgery or falsification of the official acts of the Government or public authority, including courts of justice, or the uttering or fraudulent use of the same.

13. The fabrication of counterfeit money, whether coin or paper, counterfeit titles or coupons of public debt, created by national, state, provincial, territorial, local or municipal governments, banknotes or other instruments of public credit, counterfeit seals, stamps, dies and marks of state or public administrations, and the utterance, circulation, or fraudulent use of the above mentioned objects.

14. Embezzlement or criminal malversation committed within the jurisdiction of one of the parties by public officers or depositaries, where the amount embezzled exceeds 200 dollars in the United States of America or B. 1.000 in the United States of Venezuela.

15. Embezzlement by any person or persons hired, salaried or employed, to the detriment of their employers or principals, when the crime or offense is punishable by imprisonment or other corporal punishment by the laws of both countries, and where the amount embezzled exceeds 200 dollars in the United States of America or B. 1.000 in the United States of Venezuela.

16. Kidnapping of minors or adults, defined to be the abduction or detention of a person or persons, in order to exact money from them or their families, or for any other unlawful end.

17. Larceny, defined to be the theft of effects, personal property, or money of the value of 50 dollars or B. 250 or more, accordingly.

18. Obtaining money, valuable securities or other property by false pretenses or receiving any money, valuable securities or other property knowing the same to have been unlawfully obtained, where the amount of money or the value of the property so obtained or received exceeds 200 dollars in the United States of America or B. 1.000 in the United States of Venezuela.

19. Perjury or subornation of perjury.

20. Fraud or breach of trust by a bailee, banker, agent, factor, trustee, executor, administrator, guardian, director, or officer of any company or corporation, or by any one in any fiduciary position, where the amount of money or the value of the property misappropriated exceeds 200 dollars in the United States of America or B. 1.000 in the United States of Venezuela.

21. The extradition is also to take place for participation in any of the aforesaid crimes as an accessory before or after the fact, provided such participation be punishable by imprisonment by the laws of both Contracting Parties.

### ARTICLE III

The provisions of this Convention shall not import claim of extradition for any crime or offense of a political character, nor for acts connected with such crimes or offenses; and no person surrendered by or to either of the

VENEZUELA                    940.7

Contracting Parties in virtue of this Convention shall be tried or punished for a political crime or offense. When the offense charged comprises the act either of murder or assassination or of poisoning, either consummated or attempted, the fact that the offense was committed or attempted against the life of the sovereign or head of a foreign state or against the life of any member of his family, shall not be deemed sufficient to sustain that such a crime or offense was of a political character, or was an act connected with crimes or offenses of a political character.

### ARTICLE IV

In view of the abolition of capital punishment and of imprisonment for life by Constitutional provision in Venezuela, the Contracting Parties reserve the right to decline to grant extradition for crimes punishable by death and life imprisonment. Nevertheless, the Executive Authority of each of the Contracting Parties shall have the power to grant extradition for such crimes upon the receipt of satisfactory assurances that in case of conviction the death penalty or imprisonment for life will not be inflicted.

### ARTICLE V

A fugitive criminal shall not be surrendered under the provisions hereof, when, from lapse of time or other lawful cause, according to the laws of the country within the jurisdiction of which the crime was committed, the criminal is exempt from prosecution or punishment for the offense for which the surrender is asked.

### ARTICLE VI

If a fugitive criminal whose surrender may be claimed pursuant to the stipulations hereof shall be at the time of the request for the extradition under prosecution, either at liberty, out on bail or in custody, for any crime or offense committed in the country where he has sought asylum, or shall have been convicted thereof, his extradition may be deferred until such proceedings be determined, and until he shall have been set at liberty in due course of law.

### ARTICLE VII

If a fugitive criminal claimed by one of the parties hereto shall be also claimed by one or more powers pursuant to treaty provisions, on account of crimes committed within their jurisdiction, such criminal shall be delivered to that state whose demand is first received.

### ARTICLE VIII

Under the stipulations of this Convention, neither of the Contracting Parties shall be bound to deliver up its own citizens.

### ARTICLE IX

The expense of the arrest, detention, examination, and transportation of the accused shall be paid by the Government which has preferred the demand for extradition.

### ARTICLE X

Everything found in the possession of the fugitive criminal at the time of his arrest, whether being the proceeds of the crime or offense, or which may be material as evidence in making proof of the crime, shall, so far as practicable according to the laws of either of the Contracting Parties, be delivered up with his person at the time of the surrender. Nevertheless, the rights of a third party with regard to the articles aforesaid shall be duly respected.

### ARTICLE XI

The stipulations of this Convention shall be applicable to all territories wherever situated, belonging to either of the Contracting Parties or under the jurisdiction or control of either of them.

Applications for the surrender of fugitives shall be made by the respective diplomatic agents of the Contracting Parties. In case of the absence of such agents from the country or its seat of government, or where extradition is sought from territory included in the preceding paragraph other than the United States, application may be made by superior consular officers.

It shall be competent for such diplomatic or superior Consular officers to ask and obtain the preliminary arrest of the person whose surrender is requested, before the Government of whom such request is made. The judicial functionaries shall prescribe the method of complying with the legal formalities of the country of which the extradition is requested.

If the fugitive criminal shall have been convicted of the crime for which his surrender is asked, a copy of the sentence of the court before which such conviction took place, duly authenticated, shall be produced. If, however, the fugitive is merely charged with crime, a duly authenticated copy of the warrant of arrest in the country where the crime was committed, and of the depositions upon which such warrant may have been issued, shall be produced, with such other evidence or proof as may be deemed competent in the case.

### ARTICLE XII

If when a person accused shall have been arrested in virtue of the mandate or preliminary warrant of arrest, issued by the competent authority as provided in Article XI hereof, and been brought before a judge or a magistrate to the end that the evidence of his or her guilt may be heard and examined as hereinbefore provided, it shall appear that the mandate or preliminary warrant of arrest has been issued in pursuance of a request or declaration

VENEZUELA                     940.9

received by telegraph from the Government asking for the extradition, it shall be competent to hold the accused for a period not exceeding two months, so that the demanding Government may have opportunity to lay before such judge or magistrate legal evidence of the guilt of the accused, and if at the expiration of said period of two months such legal evidence shall not have been produced before such judge or magistrate, the person arrested shall be released, provided that the examination of the charges preferred against such accused person shall not be actually going on.

### ARTICLE XIII

In every case of a request made by either of the two Contracting Parties for the arrest, detention or extradition of fugitive criminals, the legal officers or fiscal ministry of the country where the proceedings of extradition are had, shall assist the officers of the Government demanding the extradition before the respective judges and magistrates, by every legal means within their or its power; and no claim whatsoever for compensation for any of the services so rendered shall be made against the Government demanding the extradition, provided, however, that any officer or officers of the surrendering Government so giving assistance who shall, in the usual course of their duty, receive no salary or compensation other than specific fees for services performed, shall be entitled to receive from the Government demanding the extradition the customary fees for the acts or services performed by them, in the same manner and to the same amount as though such acts or services had been performed in ordinary criminal proceedings under the laws of the country of which they are officers.

### ARTICLE XIV

No person shall be tried for any crime or offense other than that for which he was surrendered.

### ARTICLE XV

This Convention shall take effect from the day of the exchange of the ratifications thereof; but either Contracting Party may at any time terminate the same on giving to the other six months' notice of its intention to do so.

The ratifications of the present Convention shall be exchanged at Caracas as soon as possible.

In witness whereof the respective Plenipotentiaries have signed the above articles, and have hereunto affixed their seals.

Done in duplicate, in Caracas, this nineteenth day of January one thousand nine hundred and twenty-two.

JOHN CAMPBELL WHITE     [SEAL]
P. ITRIAGO CHACÍN        [SEAL]

940.10          U.S. EXTRADITION TREATIES

### ADDITIONAL ARTICLE

The undersigned, John Campbell White, Chargé d'Affaires ad interim of The United States of America to Venezuela, and Dr. Pedro Itriago Chacín, Minister of Foreign Affairs of The United States of Venezuela, have agreed upon the following Additional Article to the Treaty of Extradition signed by the aforesaid on the nineteenth instant:

It is agreed that all differences between the Contracting Parties relating to the interpretation or execution of this Treaty shall be decided by arbitration.

In witness whereof they have signed the above Article, and have hereunto affixed their seals.

Done in duplicate, in Caracas, this twenty first day of January one thousand nine hundred and twenty-two.

JOHN CAMPBELL WHITE      [SEAL]
P. ITRIAGO CHACÍN         [SEAL]
